OLMECA, S.A., Plaintiff,

v.

MANUFACTURERS HANOVER TRUST COMPANY, Defendant and Third-Party Plaintiff.

MANUFACTURERS HANOVER TRUST COMPANY, Defendant and Third-Party Plaintiff,

v.

Pierre GAZANIOL, Louis Edmund Gazaniol and Philippe Gazaniol, Third-Party Defendant.

No. 84 Civ. 1984 (RWS).

United States District Court, S.D. New York.

Dec. 24, 1985.

Friedman & Shaftan, P.C., New York City, (Wilfred T. Friedman, Robert S. Groban, Jr., Sheila A. Chervin, of counsel), for plaintiff.

Robert M. Rosenblith, New York City (Manuel W. Gottlieb, Nancy J. Quaife, Maureen K. Stein, of counsel), for defendant and third-party plaintiff Mfrs. Hanover Trust Co.

## OPINION

SWEET, District Judge.

The defendant and third party plaintiff in this action, Manufacturers Hanover Trust Company ("MHT") has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint of plaintiff Olmeca S.A. ("Olmeca") against MHT or in the alternative granting partial summary judgment with respect to the second transfer at issue. MHT also seeks Rule 12(b)(6) dismissal of Olmeca's second cause of action for failure to state a claim for which relief can be granted. Olmeca has cross-motioned for an order dismissing the Tenth and Eleventh defenses asserted by MHT in its amended answer to the complaint, under Rules 12 and 56, Fed.R.Civ.P. In addition, both parties have moved for a hearing on the validity of the power of attorney or "Escritura No. 1515" in the event that these motions for summary judgment are denied. For the reasons set forth below, MHT's motion for summary judgment on the first and second transfers is denied, as is Olmeca's motion to dismiss MHT's Tenth and Eleventh defenses. MHT's motion to dismiss the second claim in Olmeca's complaint is granted, and the court will hold a hearing on the validity of the power of attorney under Panamanian law.

## Facts

Olmeca's complaint in this action arises out of two transfers made by MHT in 1981 from Olmeca's account at MHT totaling approximately $1,695,000. Olmeca's first claim for relief seeks recovery for a purported breach of contract with regard to these two transfers, and the second seeks recovery for the same loss on an alternative theory of breach of fiduciary duty.

The disputed transfers occurred as a result of a complex set of banking relationships which set the stage for inter-family mischief. In 1977, Andre Gazaniol, sole shareholder and president of Olmeca, a Panamanian corporation, contacted Banque Pariente ("BP"), a Swiss bank, located in Geneva, Switzerland, to ask BP to recommend a "trustworthy" bank in the United States in which to open an account for Loaned S.A. ("Loaned"), a Panamanian corporation which Andre Gazaniol had organized in 1959. Loaned entered into a written letter agreement with BP on November 9, 1977, which provided that BP would transmit Loaned's orders for transfer, investments and securities purchases to MHT in New York, and would forward all account documentation from MHT to Loaned. BP monitored Loaned's BP account and reviewed Loaned's MHT account to make suggestions to Loaned, but had no investment authority over the accounts. For these services BP received a one-half percent (.05%) per annum fee on Loaned's total assets at the MHT account. This same agreement also structured BP's duties with regard to Olmeca's accounts at MHT, which were actually successor accounts which received funds from the Loaned accounts at MHT. In order to open the Loaned account, BP forwarded Loaned's corporate resolution and corporate charter containing the names and addresses of Loaned's officers to MHT. Josiane Fleming ("Fleming"), the MHT account officer responsible for MHT's rela-

tionship with BP, opened the account in Region I of MHT's international division rather than the personal banking division because of BP's involvement with the account.

Olmeca and Loaned would relay account instructions to BP in Geneva, Switzerland which would then transmit these instructions to MHT in New York. MHT routed all account information through BP, which would then forward the information to Jose Ales Romero ("Romero") at Banco Hispanico Americano in Marbella, Spain, where Andre Gazaniol would periodically visit from Tangiers, Morocco to retrieve his mail. Andre Gazaniol, a citizen of France, a thirty-seven year resident of Morocco, and a tourist living in Spain for three years, admittedly established this complex chain of banking relationships to avoid the foreign exchange laws of Morocco.

In 1979, Andre Gazaniol instructed BP to open an account on behalf of Olmeca at MHT and to transfer certain of Loaned's funds to the new Olmeca account. In September, 1979, BP instructed MHT to open this new account, and sent MHT Olmeca's articles of incorporation and a power of attorney executed in favor of Andre Gazaniol. However, some procedural formalities were omitted in the opening of the account, as signature cards and account agreements were not forwarded to Olmeca for execution until approximately five months after the account had been opened. While MHT forwarded these cards and account agreements to Olmeca through BP on February 1, 1980, Olmeca claims it never received the documents, and nothing was returned to MHT.

On February 27, 1980, Andre Gazaniol notified BP to instruct MHT to close Loaned's accounts and transfer the remaining funds to the new Olmeca account. BP relayed such instructions in a cover letter to MHT, and Fleming implemented them. Until the events surrounding the allegedly negligent transfers took place, every action in the Loaned and Olmeca accounts had been similarly based on written instructions from Olmeca's offices, translated and transmitted to MHT via BP.

In March, 1981, Pierre Gazaniol, Andre's nephew, and Louis Edmund Gazaniol, Andre's son, appeared at the New York office of MHT and presented Fleming with a document entitled "Escritura No. 1515 of February 12, 1981" (hereinafter "power of attorney"). Louis Edmund Gazaniol's signature authority had been removed from Loaned's account in June of 1978, pursuant to Andre Gazaniol's instructions as relayed by BP. The power of attorney, which purported to give Pierre and his grandmother power over the Olmeca accounts, was protocolized by Olmeca's registered agent in Panama, but contained only typed signatures and did not contain stamps indicating that it had been filed in the Panamanian public registry. The parties contest the legal validity of the document under Panamanian law.

The facts surrounding Fleming's treatment of this power are hotly contested. According to Fleming, she could not read or did not recognize the document, which was written in Spanish, and gave it to her supervisor, Henry Bewer, to review. Fleming remembers that Bewer told her that the document gave Pierre Gazaniol a power of attorney over the account. Henry Bewer's deposition testimony states that it would have been "highly unlikely" for him to reach this conclusion after a cursory review of the document, and he claims to have advised Fleming to discuss the purported power with BP. Fleming had received a similar power of attorney executed in favor of Andre Gazaniol in connection with the opening of the Loaned accounts, and had forwarded it to MHT's legal department for examination. The next day, acting on the authority of the power of attorney, Fleming permitted Pierre Gazaniol to execute signature cards, sign an account agreement and direct MHT to stop rolling over regularly scheduled time deposits in the account. Although Fleming did not tell Pierre Gazaniol of these certificates of deposit, Pierre Gazaniol knew that

these funds would be soon credited to Olmeca's account.

On March 30, 1981, approximately two weeks after the power was first presented, Fleming made a business trip to Switzerland and met with Joseph and Stanley Abensur, BP's managing directors. While both parties concede that Fleming had a conversation with Stanley Abensur on April 10, 1981, where the subject of power arose, the contents and character of the discussion is in doubt, Fleming's deposition testimony on the issue is equivocal, and Olmeca has not produced counter testimony of Stanley Abensur on the issue. Fleming claims that she "mentioned" that Pierre Gazaniol gave her a document which purported to give him power of attorney over Olmeca's account. Abensur reportedly confirmed that Pierre was a member of the Gazaniol family and expressed no reservations concerning MHT's receipt of the document. Olmeca characterizes this conversation as "incidental," and "informal" observing that Fleming did not show the power of attorney to Stanley Abensur and was not seeking approval for transfer of funds based on the power because no such request had been made.

When Fleming returned to MHT she found a letter dated April 3, 1981 from Pierre Gazaniol requesting her to transfer $890,000, or approximately 50% of the Olmeca account balances, to a numbered account at MHT's Zurich branch. On April 14, 1981 Fleming made the transfer. Pierre Gazaniol subsequently withdrew these funds from MHT's Zurich branch on April 21, 1981 and they have not been recovered. The parties are also in dispute as to the documentation of this transfer. Both parties concede that on April 14, 1981, MHT mailed a debit advice for the account to Olmeca via BP in the amount of $890,000. However, neither Fleming nor MHT has been able to determine exactly when the Olmeca account statements were sent to BP, although MHT does state that the statements were mailed shortly after April 30, 1981 and no later than May 6, 1981.

The second transfer request was dated May 21, 1981, when Pierre Gazaniol instructed MHT to transfer $805,000 to Olmeca's account at BP. This transfer occurred seven weeks after the debit advice was mailed to BP after the first transfer, and four weeks after MHT allegedly mailed the account statements to forward to BP. On June 3, 1981, MHT made the requested transfer and debited the account, and mailed a similar debit statement to Olmeca via BP. These funds were transferred to Olmeca's account at BP and on April 23, 1981, June 4, and June 5, BP, acting on the same power of attorney which had been presented to MHT, paid Pierre Gazaniol $830,075 from the Olmeca account at BP.

## DISCUSSION

### Summary Judgment

A motion for summary judgment may not be granted "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1970). The Second Circuit strictly applies these rules, *Rodriguez v. Village of Larchmont,* 608 F.Supp. 467, 471 (D.C.N. Y.1985), reserving summary judgment for cases which present no genuine issues of material fact. This strict standard is applied in recognition of the fact that summary judgment deprives the non-moving party of the opportunity for a full factual development of the record through trial, *see Jaroslawicz v. Seedman,* 528 F.2d 727, 731 (2d Cir.1975), and the severity of its consequences requires the district courts to resolve all reasonable inferences in favor of the party opposing the motion. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor,"* 691 F.2d 603, 606 (2d Cir.1982).

After thoroughly reviewing the record, neither MHT nor Olmeca has met its burdens of demonstrating that no mate-

rial disputed facts exist on the issues which they propose for summary judgment. These issues present questions of due care, reasonableness and negligence which are particularly suited to resolution by jury. A brief sketch of the central arguments presented in these motions is necessary to demonstrate the materiality of these disputed facts.

## MHT's Motion

MHT claims that Olmeca is equitably estopped from contesting both the first and second transfers from the account, because MHT, through Fleming's conversation with Stanley Abensur, gave notice of the power of attorney to BP which was bound, as Olmeca's agent, to transmit this information to Olmeca. It is claimed that Olmeca is therefore estopped from challenging the transfers because it had imputed knowledge of the impending fraud led MHT to rely on the validity of the power of attorney. To establish this equitable estoppel in New York, MHT must demonstrate that:

1. Olmeca had actual or constructive knowledge of the real facts;

2. Olmeca demonstrated conduct which amounted to a false representation or concealment of material facts which gives the impression that the facts are other than as asserted.

3. Olmeca intended or expected that such conduct would be relied on by MHT.

4. MHT lacked the knowledge and means of acquiring knowledge of the real facts.

5. MHT relied on the conduct of the party to be estopped.

6. MHT acted in such a way as to prejudicially change his position.

*United States v. Bedford Associates*, 491 F.Supp. 851, 866–67 (S.D.N.Y.1980), *aff'd in part and rev'd in part on other grounds*, 657 F.2d 1300 (2d Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), *quoting State Bank of Albany v. Fioraranti*, 70 A.D.2d 1011, 418 N.Y.S.2d 202 (3d Dept.1979), *aff'd*, 51

N.Y.2d 638, 435 N.Y.S.2d 947, 417 N.E.2d 60 (1980).

Olmeca contends that it is not estopped from asserting its claims because BP was not Olmeca's agent and thus BP's knowledge could not be imputed to Olmeca. Furthermore, Olmeca claims that Fleming's notice was not notice at all, that it did not have the duty to speak, and that Fleming and MHT did not rely on its silence in handling of the account over to Pierre Gazaniol. According to Olmeca, MHT has not demonstrated that it is a proper party to assert equitable estoppel because MHT had constructive knowledge of the fraud and the means of acquiring knowledge of Pierre Gazaniol's fraud in the files kept for the Loaned account. Olmeca also opposes MHT's request for a partial summary judgment on the second transfer, stating that the absence of MHT's due care in paying out the funds and gross negligence in the honoring of the falsified power of attorney was the proximate cause of the second loss.

■ Olmeca vehemently disputes that relaying this purported oral notice was within the scope of BP's actual or apparent authority. Olmeca raises three principal questions of fact to be resolved concerning the scope of the agency here:

1. Whether MHT, BP and Olmeca had agency relationships and if so, what were their scope.

2. Whether MHT exercised reasonable care in ascertaining the scope of BP's authority.

3. Whether MHT could reasonably believe that BP's minesterial authority from Olmeca included the power to receive oral notices from MHT.

MHT relies on BP's letter agreement with Olmeca to create an agency sufficient to justify the imputation of notice to Olmeca, a document of which MHT was unaware until late in the discovery phase of these proceedings. (Gazaniol Decl. Exh. L). However, to obtain summary judgment on this issue, MHT must demonstrate that the contractual language is not "susceptible of at least two fairly reasonable meanings." *Schering Corp. v. Home Ins. Co.*, 712 F.2d

4, 9 (2d Cir.1983). Here Olmeca has offered both alternative constructions of the language of the agreement, Andre Gazaniol's testimony that the bank's duties were completely minesterial, (Gazaniol declaration ¶ 18, 19) and a description of the day-to-day ministerial functions of the BP concerning the MHT accounts. Olmeca has also produced, *inter alia*, a telex from BP to MHT regarding its authority over the Loaned account, which states "Banque Parrente will not have authorization to give you instructions. Once the accounts are functioning properly, our action will be limited to receiving your mail and transmitting same." (Friedman decl., Exh. F.) In light of the fact that Fleming concededly relied on Loaned's documents in lieu of re-executing some of the formalities in the newly opened Olmeca account, the inferences and conclusions to be drawn from these conflicting documents and equivocal deposition testimony of Andre Gazaniol should be in the hands of the jury. *See Index Fund v. Hagopian,* 609 F.Supp. 499, 508 (S.D.N.Y. 1985) (where record supports contrary inferences, a question of agency is a factual one for the trier of fact).

**Notice**

Perhaps the most critical issue in MHT's equitable estoppel theory is the sufficiency of the oral notice of Pierre Gazaniol's fraud which Fleming gave to Stanley Abensur and by imputation gave to Olmeca. This court finds disputed facts concerning both the substance of the conversation and conflicting evidence as to whether Fleming relied on the conversation with Abensur to confirm the validity of the power of attorney.

Fleming's deposition testimony, taken on three different occasions, was ambiguous as to the content of her conversation with Stanley Abensur, although she remembered informing Abensur that Pierre Gazaniol had presented her with a power of attorney and that Abensur had confirmed that he was Andre Gazaniol's nephew. While Fleming stated that she was convinced after this conversation that "Stanley Abensur did not find it abnormal that

Pierre had power over the account" (Dept. at 410, exh. F to Gottlieb Statement), her credibility as to the substance of the conversation and her insistence that she relied on Abensur's silence is an issue of fact for the jury to determine.

■ MHT asserts that Olmeca has not produced any evidence discrediting Fleming's testimony because it has not secured the deposition testimony of Stanley Abensur. Clearly Olmeca's mere assertion that Fleming's undisputed testimony can be impeached at trial will not defeat a summary judgment motion without a demonstration that it has evidence which places her credibility at issue. *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981); *Radix Organization v. Mack Trucks, Inc.,* 602 F.2d 45, 48 (2d Cir.1979). However, this court finds that Olmeca has produced conflicting evidence on the conversation itself (Azagury Deposition, P. 147, 153) and has produced evidence to demonstrate that contrary to her deposition testimony, she did not rely on Stanley Abensur's silence. Such evidence includes the disputed conduct of her supervisor, Henry Bewer, in his cursory review of the power, her grant of signature cards, and her execution of Pierre Gazaniol's instructions to alter the time deposits in the account long before Fleming's visit to BP and conversation with Stanley Abensur. Reconciliation of this conflicting evidence on Fleming's credibility, her actual reliance on BP's silence and the reasonableness of that reliance is appropriately a task for the jury.

**Estoppel and Constructive Knowledge**

Olmeca argues that MHT cannot properly assert equitable estoppel against Andre Gazaniol because MHT had constructive knowledge of the real facts concerning the falsified power of attorney, and would have discovered the falsity of the power if it had fulfilled its duty to check on BP's scope of authority before allegedly relying on imputed knowledge to make the transfer out of the Olmeca accounts. MHT contends that it had neither knowledge nor the

means of acquiring knowledge of the "true facts" or the falsity of the power and that MHT did rely on Abensur's silence. According to MHT, nothing about Pierre and Edmund Gazaniol's visit to MHT could have given MHT notice of impending fraud. However, Olmeca's evidence concerning the events of that March, 1981 visit puts that assertion in sufficient doubt to create a material issue of fact for jury resolution.

First, Olmeca points out that the delivery of the power itself occurred under suspicious circumstances, with the unannounced appearance of Pierre and Louis Gazaniol at the MHT New York branch office. According to Olmeca, Louis' presence with Pierre was a warning signal in itself, as Louis' signature previously had been removed from the Loaned accounts under instructions from Andre Gazaniol. Second, it was unreasonable to rely on the power without checking on its validity because the power purported to convey only a revocable authority and MHT was under the duty to question its continued grant of the power. Finally, Olmeca contends the facial invalidity of the power; the absence of the public registry stamps from the document and the presence of only typed signatures, should have alerted Fleming that the power was a forgery, particularly in light of the fact that Fleming could have compared the forged power to the properly executed power in the Loaned account drawn in behalf of Andre Gazaniol. Both the existence and reasonableness of this reliance on the power of attorney are matters which should be resolved by the trier of fact.

**The Second Transfer**

MHT contends that it is entitled to summary judgment on the issue of the second transfer of $805,000 from Olmeca's account at MHT to Olmeca's account at BP. First, MHT asserts that its debit statement and account statements gave Olmeca adequate notice that its account was being "looted" by Pierre Gazaniol, and that Olmeca had seven weeks after the debit statement and four weeks after the purported mailing of the account statements in which to notify MHT that the power of attorney was forged. In addition to this notice argument, MHT also claims that its actions were not the proximate cause of the damage incurred by the second transfer because the funds were transferred from Olmeca's account at MHT to Olmeca's account at BP, which then honored the same falsified power of attorney and permitted Pierre Gazaniol to withdraw the funds. Olmeca responds that MHT's notice cannot erase its own negligent release of funds and lack of due care in the administration of the account, and that MHT's negligent release of the funds caused them to be transferred to a foreign bank where Olmeca had not desired the funds to be placed. Because MHT has not demonstrated that Olmeca "cannot prevail under any circumstances" *Heyman v. Commerce and Industry Ins. Co., supra,* 524 F.2d at 1319–1320, it has not carried its burden for succeeding in the grant of summary judgment on the second transfer.

MHT's notice and estoppel authorities do not pre-empt Olmeca's assertion that MHT's negligence in handling the account in general and in handling the power of attorney in particular must be factors weighed against the issues of the written notice of the second transfer and Andre Gazaniol's alleged negligence in constructing a convoluted system of correspondence which delayed the receipt of his account information. The persistence of these questions of constructive knowledge of the fraud and negligent mishandling of the account requires the reasonableness of this second transfer to be placed in the hands of the jury.

MHT's citation of *Fustok v. Conticommodity Services, Inc.,* 577 F.Supp. 852 (S.D.N.Y.1984), a case strikingly similar to the one at bar, demonstrates that as a matter of law, Olmeca is entitled to raise MHT's alleged negligence as a factor to be weighed in the "notice" calculation. In *Fustok,* a Saudi Arabian investor sued a commodities broker alleging unauthorized trading and commodity laws violations in connection with the brokerage firm's use of his personal account to cover margin calls

during the period when the price of silver was plummeting. The defendants asserted that the confirmation slips and monthly account statements, reflecting transactions in the account, were mailed pursuant to Fustok's direction to his agent in Switzerland, Advicorp Advisory Financial corporation, and that neither Fustok nor Advicorp complained about transactions in the account until the price of silver began to fall. The district court denied the defendants' motion for summary judgment because there was an issue of fact as to conticommodity's actual knowledge of Advicorp's authority to trade Fustok's personal account. However, in connection with effect of the written notice to Fustok and Advicorp, the Honorable Morris E. Lasker observed:

> As to the issue whether Fustok is bound by Advicorp's receipt of confirmations, the relevant rule is that when a principal has invested an agent with authority over his affairs, "notice to the agent ... is notice to the principal, unless the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal."
>
> *Hence, if there were no dispute that the defendants had in good faith relied upon Fustok's signing of the account documents and Advicorp's apparent authority over Fustok's silver investments,* Fustok's conclusory assertions that he did not authorize trading in the OSS account would not present dismissal of his complaint.

*Id.* at 856–857 (emphasis added).

This excerpt from *Fustok* demonstrates that MHT's good faith reliance on the power of attorney is an issue still relevant in the context of written notice to the depositor. Olmeca's citation of *Boutros v. Riggs National Bank*, 655 F.2d 1257 (D.C.Cir. 1981) supports its contention that issues of the bank's negligence (or constructive knowledge of the fraud) are appropriately left to the decision of the jury even in light of notice to the depositor of the ongoing fraud. *Boutros*, an Egyptian citizen, opened an account in the United States in order to avoid Egyptian currency regula-

tions which he monitored through an American agent. From February through September of 1977, the agent wrongfully withdrew over $21,000 from the account, but the bank disclaimed liability for the withdrawals because of the depositor's failure to examine his account statements during the intervening eight month period. The D.C. Circuit, upholding the right of the jury to decide the issue of liability for the wrongful transfer, stated:

> The evidence establishes that Boutros did not inspect the bank statements simply because he did not receive them. The statements were mailed, pursuant to Boutros' instruction, to Beshai. The issue is thus framed as whether this arrangement constituted negligence on the part of Boutros.
>
> Boutros candidly informed Riggs that he wanted the statements to be sent to Beshai to avoid detection of the account by Egyptian authorities. It is apparent that Boutros had known Beshai for some time, and that Boutros had utilized Beshai's services. Beshai, however, did not sign the signature card and no power of attorney was ever filed with Riggs authorizing him to make withdrawals. After examining the entire record, we find that the evidence was not so conclusive as to warrant the removal of the issue of Boutros' negligence from the jury.

*Id.* at 1261. If the eight month failure to examine account statements despite written notice did not preclude a jury's examination of the negligence present in the management of the *Boutros'* account, it should not preclude such an examination in the case at bar, where there remains some doubt as to the date upon which the account statements were mailed. Olmeca also highlighted the D.C. Circuit's observation that Uniform Commercial Code ("UCC") Section 4–406 (McKinney's) is consistent with this treatment of estoppel and notice because it provides that a depositor has a reasonable time to advise the bank of any problems with his statement, and provides that the plaintiff should recover if he establishes that the bank paid out on a

forged item and either (a) the bank fails to prove negligence by the depositor or (b) the depositor proves negligence by the bank. UCC Section 4–406.

MHT's attempts to distinguish *Boutros* by observing that while the D.C. Circuit explicitly held that Section 4–406 applies to savings withdrawal slips, it does not apply to Olmeca's account because the debit advices are not an "item" returned to the customer with his statment within the meaning of Section 4–104(g). However, even if the debit advices do not fall within the confines of § 4–406, it retains the force of analogy, particularly in view of MHT's own reliance on the body of the section as a "codification" of the depositors common law duty to examine bank statements and report errors without unreasonable delay. (MHT's reply memorandum of law, p. 40–41). The jury is thus entitled to evaluate MHT's alleged negligence in maintaining the Olmeca account in relationship to Andre Gazaniol's allegedly negligent monitoring of his account information.

Similarly, MHT's analysis of the issue of proximate causation does not remove it from the reach of the jury. MHT contends that Olmeca's loss was incurred on the second transfer because of the intervening acts of Pierre Gazaniol in withdrawing the transferred funds from Olmeca's account at BP. Olmeca claims that the evaluation of proximate cause in this circumstance presents a question of comparative negligence, as MHT bears the responsibility for allegedly breaching its duty to present unauthorized transfers from the American account, and its later wrongful removal does not alter MHT's responsibility for the initial transfer.

MHT's citation of *Quad Cinema Corp. v. First National City Bank*, N. 66044/74, slip op. (Civ.Ct.N.Y.Co., Jan. 21, 1975) undercuts MHT's assertion that BP's conduct as a matter of law is the proximate cause of the loss of the second transfer. In *Quad Cinema* the court held that the defendant bank was not responsible for the loss incurred in connection with a check forged by the plaintiff's employee:

The proximate cause of the loss was clearly the embezzlement, not the failure of the bank in clearing the check. *Saugerties Bank v. Delaware Hudson Co.*, (236 N.Y. 425, 430 [141 N.E. 904]), stated "the act of a party sought to be charged is not to be regarded as a proximate cause unless it is in clear sequence with the result and unless it could have been reasonably anticipated that the consequences complained of would result from the alleged wrongful act" (See also *Dunn v. State of New York*, 29 N.Y.S.2d [N.Y.2d] 313 [, 327 N.Y.S.2d 622, 277 N.E.2d 647).

Olmeca's claims that MHT had constructive knowledge of fraud and that MHT could have recognized from both the face of the power and the circumstances of its presentation that it was fraudulently obtained is an allegation that MHT could have reasonably anticipated the consequences of the transfer. As such it must be resolved by the jury. Although *Davis Aircraft Products Co. v. Bankers Trust Company*, 36 A.D.2d 705, 319 N.Y.S.2d 379 (App.Div. 1st Dept.1971) supports MHT's contention that in some circumstances the subsequent negligent acts of a transferee bank will relieve a defendant bank of its responsibility for causation of the loss, the allegations in *Davis* concerned the honoring of forged checks, and did not present claims of constructive knowledge of the fraud as are present in Olmeca's complaint.

**The Second Claim**

 MHT also seeks summary dismissal pursuant to Rule 12(b)(6) of Olmeca's second claim for relief which is based on MHT's alleged breach of fiduciary duty to Olmeca. MHT contends that the relationship between a bank and depositor is that of debtor and creditor, and that MHT had no fiduciary duty to breach. Olmeca claims that MHT was acting in a fiduciary capacity with respect to the account, and that its second claim for relief also states a cause of action for negligence in the handling of Olmeca's account.

Both parties agree that a bank and a depositor have an implied or express contractual relationship and the bank only becomes the fiduciary of the depositor when it acts as an agent or trustee. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112 (2d Cir.1984). Olmeca has been unable to substantiate its claim that MHT functioned as an agent or trustee over the Olmeca account. The ordered liquidation of Loaned's securities and the selection of time deposits in which to place the cash proceeds of the liquidation evidences no discretionary authority over Olmeca's funds. *Id.* at 122–23. These actions were taken at the behest of Andre Gazaniol, who specifically instructed MHT to renew the balance of the time deposits for three months at its "best conditions."

Although Olmeca seeks to breathe life into its second cause of action by asserting that it states a claim for negligence as well as for breach of fiduciary duty, this claim has no merit. Any claims which Olmeca has against MHT spring from their contractual relationship and do not create a tort independent of the contract claim. Where the contractual relationship of the parties defines the rights of each, the breach of that contract does not result in a "wrong" which is separately actionable. *Stella Flour & Feed Corp. v. National City Bank of New York*, 285 A.D. 182, 136 N.Y.S.2d 139 (1st Dept.1954); *Luxonomy Cars, Inc. v. Citibank, N.A.*, 65 A.D.2d 549, 408 N.Y.S.2d 951 (2d Dept.1978) (a tort may accompany a breach of contract but only where the contract creates a relation out of which springs a duty independent of the contract obligation and that independent obligation is also violated). Although the court in *Stella Flour* applied this concept to an express contract between depositor and bank, Olmeca has offered no reason to limit its application to express rather than implied contracts as Olmeca had with MHT.

Olmeca's second claim is, therefore, dismissed for failure to state a claim upon which relief can be granted.

## Olmeca's Motion to Dismiss the 10th and 11th Defenses in the Amended Answer

Olmeca claims that MHT's Tenth and Eleventh affirmative defenses may be summarily dismissed because they are legally unsupportable and stem from undisputed factual occurrences. MHT has submitted a Local Rule 3(g) statement of the disputed facts pertinent to the motion, and has protested Olmeca's characterization of its defenses. A review of MHT's defenses reveals that most of the facts required to determine these issues are contested and unclear, and that summary judgment on these issues would be premature. MHT's Tenth defense states:

> "58. If the loss complained of by Olmeca was due to the dishonest acts of members of the Gazaniol family who had access to Olmeca's financial records and its corporate documents, then, as between Olmeca and MHT, Olmeca, as the more culpable party, must bear the loss."

Olmeca claims that this defense imputes the misconduct of the Gazaniol family to Olmeca president Andre Gazaniol, and as such has no basis in New York law. This is a mischaracterization of the defense, which actually asserts Andre Gazaniol's negligence in managing his own corporate affairs as a defense to MHT's liability. Olmeca's contention that this construction of the Tenth defense is redundant is unconvincing. While the Eighth defense does concern Olmeca's liability for losses sustained because of its negligence in monitoring the account, and the Ninth defense is a defense based on Olmeca's negligent failure to read the account statements, these defenses do not preclude a more general allegation that Andre Gazaniol's negligent handling of Olmeca's financial records and documents should be held against him. This question of comparative negligence raises sufficient factual questions to require full presentation of the defense at trial.

### The Eleventh Defense

MHT's Eleventh defense rests on events subsequent to the two fraudulent transfers of funds. MHT claims that it is the benefi-

ciary of a settlement agreement (Accord Transactionnel) purportedly entered into by the Gazaniol family members on June 25, 1982 and which by its terms protected MHT from actions to recover the wrongfully transferred funds. MHT alleges in its Eleventh Defense:

60. Subsequent to the First Transfer and the Second Transfer, Andre Gazaniol as president of Olmeca agreed to accept certain consideration from third party defendant Pierre Gazaniol in return for abandoning his claim to recover the funds transferred.

61. Subsequent to June, 1982, Andre Gazaniol as president of Olmeca did in fact accept certain considerations from Pierre Gazaniol.

62. Olmeca thereby ratified the First Transfer and the Second Transfer.

Olmeca contends that the settlement agreement was never completely implemented, that this failure to fulfill all the conditions of the document resulted in a recission of the agreement, that MHT is not a third party beneficiary of the agreement, and that Andre Gazaniol never executed the agreement because he was unconscious and in the hospital during the negotiation and execution of the settlement.

■ By the legal standards articulated in Olmeca's own memorandum of law, however, MHT has raised substantial legal arguments in the context of disputed material facts to warrant submitting the impact of the settlement agreement to the jury. Olmeca observes that MHT may recover as the third party beneficiary of the agreement "only by establishing (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit, (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him for the benefit is lost. *Burns, Jackson, Miller, Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y. S.2d 712, 722, 451 N.E.2d 459 (1983). A review of these prerequisites demonstrates

that the facts on each are contested. First, the parties contest the mere signing of the accord with conflicting affidavit evidence. Olmeca claims that Andre Gazaniol's signature was forged while he was unconscious and hospitalized; MHT contends that the deposition testimony of Salvador Azagury as to the level of Andre Gazaniol's participation and consciousness during the negotiation of the accord demonstrates that the accord was validly executed. While Olmeca asserts that the inter familial accord was never intended to benefit MHT, Azagury testified that the accord was intended to end all Gazaniol family disputes over the MHT transfers at issue. Because intent of the parties governs the third party scope and effect of the releasing document, *Goldbard v. Empire State Insurance Co.,* 5 A.D.2d 230, 171 N.Y.S.2d 194 (1st Dept. 1958) and a dispute as to this intent and state of mind of the signatures is obvious from the pleadings, summary judgment would be inappropriate. *International Mining Co., Inc. v. Allen & Co., Inc.,* 567 F.Supp. 777, 785 (S.D.N.Y.1983). Because these clear issues of disputed material facts exist, this court need not reach the parties dispute over the invocation of foreign law.

### Rule 44.1 Hearing

■ Although both parties join in petitioning this court for a Rule 44.1 hearing on the validity of the power of attorney under Panamanian law, Olmeca requests an expansion of the hearing to include issues of Swiss and Spanish law. Olmeca contends that MHT's Eleventh defense, based on the purported settlement agreement, raises issues of Spanish law, and that the agency relationship between BP and Olmeca is governed by Swiss law. This court concludes that the hearing will extend only to issues of Panamanian law.

MHT correctly observes that New York law governs BP's status as agent in this suit between Olmeca and MHT. Applying New York conflict of law principles, *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.

1477 (1941), the law applicable to questions of contract is determined by a "grouping of contacts" or "center of gravity" test. *Fleet Messenger Service, Inc. v. Life Insurance Company of North America,* 315 F.2d 593 (2d Cir.1963). Under this test, New York law should govern the analysis of this agency relationship. MHT has demonstrated that all deposits and withdrawals from the MHT account were made in New York, BP forwarded Olmeca's instructions to MHT in New York, the rights and responsibilities with respect to the underlying account are determined by New York law. In sum, all expectations relevant to Olmeca's account at MHT and the manifestations and effect of BP's agency relationship with Olmeca should be governed by New York law which has the greatest interest in determining whether a New York bank may rely on the agency relationship between a foreign bank and a foreign customer. In addition, the affidavit of Michael Werder on the Swiss laws of agency submitted by MHT eliminates the need to hear such testimony and demonstrates without Olmeca's opposition, that Swiss law on agency does not differ substantially from New York law.

**Spanish Law**

█ MHT's Eleventh defense does not invoke the validity of the settlement agreement under Spanish law, but asserts that partial performance of the accord may constitute a ratification by Olmeca and its officers of Pierre Gazaniol's prior withdrawal of funds based on the allegedly forged power of attorney. Because the only relevance of this accord is its impact on the allegedly wrongful transfer which is governed by New York law, New York law also governs this ratification defense.

For the aforementioned reasons, MHT's motion for complete or in the alternative partial summary judgment is denied, as is Olmeca's motion for summary dismissal of the Tenth and Eleventh Defenses in MHT's amended answer. MHT's motion to dismiss Olmeca's second claim based on breach of fiduciary duty is granted, as is the motion for a hearing on the validity of

Escritura 1515 under Panamanian law. In the absence of any objections by counsel for the parties, the hearing on Panamanian law will take place at a time convenient to counsel and the court.

IT IS SO ORDERED.