**OLMECA, S.A., Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY, Defendant and Third-Party Plaintiff.**

**MANUFACTURERS HANOVER TRUST COMPANY, Defendant and Third-Party Plaintiff,**

v.

**Pierre GAZANIOL, Louis Edmund Gazaniol and Philippe Gazaniol, Third-Party Defendants.**

**No. 84 Civ. 1984 (RWS).**

United States District Court,
S.D. New York.

July 15, 1986.

Friedman and Shaftan, P.C., New York City (Robert S. Groban, Jr., Wilfred T. Friedman, of counsel), for plaintiff.

Robert M. Rosenblith, New York City (Manuel W. Gottlieb, Maureen K. Stein, Eugenia Brennan De Rosa, New York City, Ricardo Alberto Arias, Galindo, Arias and Lopez, Panama 5, Republica de Panama of counsel), for defendant and third-party plaintiff.

## OPINION

SWEET, District Judge.

Defendant Manufacturers Hanover Trust Company ("MHT") and plaintiff Olmeca, S.A. ("Olmeca") have jointly moved for a hearing pursuant to Fed.R.Civ.P. 44.1 to determine the validity of a power of attorney (the "Escritura") under the applicable law of the Republic of Panama. Familiarity with this court's prior opinion of December 24, 1985, 629 F.Supp. 214, denying MHT's prior motion for summary judgment and Olmeca's motion to set aside certain of MHT's defenses, is assumed, and the prior opinion sets forth the need for the hearing. The hearing took place on March 26–28, 1986, and by agreement of the parties the submission of post-hearing memoranda was completed on May 15, 1986.

Olmeca contends that MHT could not properly rely on the Escritura to transfer funds from the Olmeca account, as the minutes granting such power of attorney remain invalid despite subsequent authentication and protocolization, and that MHT bore the risk of forgery because it relied on the Escritura despite the fact that it was not entered in the Panamanian Public Registry. MHT contends that the consular authentication in Morocco entitles the Escritura to a presumption of validity under Panamanian law regardless of its registration, that the protocolization by Olmeca's resident agent is binding on Olmeca, and that the Escritura's appearance of regularity and the course of dealing between Olmeca and MHT estops Olmeca from challenging MHT's reliance. As set forth more fully below, under Panamanian law, the power of attorney at issue here was authenticated in such fashion as to deprive it of presumptive regularity, and alternatively, even if properly authenticated, the power of attorney created only a rebuttable presumption of regularity.

The stipulation of facts, the sections of the Commercial, Civil, Judicial, and Fiscal Codes, the decrees and laws of Panama together with the expert testimony certainly stretch the capacities of a court trained to understand and implement a different

legal system. Despite the longing by the court for a clear precedent resolving a similar situation, namely, the rights of the parties under a forged power of attorney, the issue turns upon the interpretation of code sections and divergent expert testimony of lawyers, professors and bankers. It is indeed daunting to strive to become an instant civil code jurist. The parties and their counsel, however, have done their utmost to assist in this undertaking within the framework of our adjudicatory system and practice.

In order to permit a resolution of these issues the parties have stipulated to certain facts for the purpose of this hearing alone. They are:

a. On November 10, 1977, Banque Pariente ("Pariente") of Geneva, Switzerland, one of MHT's correspondent banks requested that MHT open an account in the name of Loaned, S.A. ("Loaned"), a Panamanian corporation incorporated in 1959, of which Andre Gazaniol was the president.

b. In September, 1979, Pariente requested MHT, on the authority of a letter from Andre Gazaniol in his capacity as Chairman of Loaned, to open an account in the name of plaintiff Olmeca, a Panamanian corporation incorporated in 1979, of which Andre Gazaniol was (and is) also president, and to transfer all but $50,000 of the funds in the Loaned account into the Olmeca account. MHT subsequently made this transfer.

c. On or about January 15, 1981 Maria Teresa Gauthey, Panamanian Consul to Morocco at Casablanca certified as authentic the purported signatures of Andre Gazaniol and Claude Renisio on the minutes (in Spanish) of a purported meeting of the board of directors of Olmeca dated January 15, 1981 (the "Minutes"). Those Minutes purportedly granted Pierre Gazaniol, Andre Gazaniol's nephew, and Leontine Gazaniol, Andre Gazaniol's mother, power of attorney over Olmeca's accounts.

d. Maria Teresa Gauthey forwarded the Minutes as certified by her to the law firm of Fabrega Lopez y Pedreschi in Panama City, Panama, Olmeca's resident agent in Panama during the period 1980–81.

e. Dr. Carlos Bolivar Pedreschi, a member of Fabrega Lopez y Pedreschi, took the Minutes to the office of Gustavo Escobar Pereira, Fourth Notary Public of the Circuit of Panama, for protocolization.

f. In the presence of Dr. Pedreschi and two witnesses, the Fourth Notary protocolized the document on February 12, 1981. The Minutes were retyped in their entirety (including typed, instead of written, "signatures" of Andre Gazaniol and Claude Renisio), and these retyped minutes, together with certain prefatory language preceding the minutes and certain signature certifications at the end of the minutes, created a new document, Escritura No. 1515 of February 12, 1981 (4th Notary) ("Escritura No. 1515"). The original of the Minutes was filed in the Fourth Notary's office in Panama City. Subsequently, duplicate examplars, all known as Escritura No. 1515, were prepared by the Fourth Notary. Escritura No. 1515 was not registered in the Public Register prior to presentation of it to MHT.

g. In mid-March, 1981, Pierre Gazaniol, Andre Gazaniol's nephew, and Louis Edmund Gazaniol, Andre Gazaniol's son, came to MHT's offices in New York and informed MHT that Pierre Gazaniol had received a power of attorney with respect to Olmeca's accounts.

h. During that visit Pierre Gazaniol presented a duplicate exemplar of Escritura No. 1515 which purported to grant Pierre Gazaniol and Leontine Gazaniol powers of attorney with respect to Olmeca's bank accounts.

i. On the authority of Escritura No. 1515 and pursuant to instructions contained in letters from Pierre Gazaniol to MHT dated April 3, 1981 and May 21, 1981, MHT transferred $890,000 on April 14, 1981 from Olmeca's account at MHT in New York to account "863 Helene" at MHT's Zurich branch, and $805,000 on

June 3, 1981 to Olmeca's account at Pariente. The $890,000 transferred to account 863 Helene, which was in the names of Pierre, Philippe and Louis Edmund Gazaniol at MHT's Zurich branch, was subsequently withdrawn and the account was closed.

j. Olmeca caused Escritura No. 14,-303 of December 31, 1981 (4th Notary) ("Escritura No. 14,303") and Escritura No. 144 of January 6, 1983 (4th Notary) ("Escritura No. 144") to be protocolized and placed on the Public Registry. In these Escrituras, Olmeca registered Escritura No. 1515 and revoked and disavowed it. The signatures of Andre Gazaniol and Claude Renisio on the Minutes are not genuine.

Certain exhibits and portions of the law of Panama were stipulated by the parties and admitted:

a. The Minutes of the meeting of the board of directors of Olmeca of January 15, 1981.

b. Escritura No. 1515 as presented to MHT.

c. Minutes of the meeting of the board of directors of Olmeca of April 25, 1979.

d. Escritura No. 4338 of May 7, 1979 (4th Notary), a protocolization of the minutes of a meeting of the board of directors of Olmeca of April 25, 1979.

e. Minutes of the meeting of the board of directors of Olmeca of February 19, 1979.

f. Escritura No. 1808 of February 19, 1979, a protocolization of the minutes of a meeting of the board of directors of Olmeca of February 19, 1979.

g. Minutes of the meeting of the board of directors of Olmeca of November 23, 1981, at which the power of attorney to Pierre Gazaniol and Leontine Gazaniol was revoked.

h. Escritura No. 14,303 of December 31, 1981, a protocolization of the revocation of the grant of a power of attorney to Piere Gazaniol and Leontine Gazaniol.

i. Escritura No. 144 of January 6, 1983, a protocolization of the revocation of the grant of a power of attorney to Pierre Gazaniol and Leontine Gazaniol.

j. Commercial Code Arts. 1–11, 55–70, 194–248.

k. Civil Code Arts. 1–13, 1132–40, 1726–1803.

l. Judicial Code Arts. 414–57, 568–90, 880–915.

m. Fiscal Code Arts. 414–28.

n. Law 52 of 1917 on Negotiable Instruments.

o. Decree No. 130 of 1948.

p. Decree No. 10 of 1957.

q. Law 32 of 1927 Arts. 1–6.

r. Decree No. 147 of 1966.

s. Law 10 of 1930.

t. Decree No. 9 of 1920 Arts. 2, 13, 31, 46.

u. *Alberto Mizrachi Y Cia Ltd.*, Supreme Court of Panama 1947.

x. Jorge Fabrega P., *Medios de Prueba*, excpts. pp. 223–227, cases cited therein.

y. Jurisprudencia de la Corte Supreme de Justicia de Panama, excpt. pp. 122–23, cases cited therein.

z. Arroyo, Twenty Years of Jurisprudence of the First Civil Chamber of the Supreme Court of Panama: 1961–1980, excpts.

aa. Correspondence July 14, 1981—January 25, 1982 between Arias, Fabrega & Fabrega, Panama, R. de P. and Lenz Schluep, Briner & DeCoulon, Geneva, Switzerland.

In addition, the court was privileged to hear the testimony of Dr. Gabriel Castro Suarez, a member of the firm of Arosemena, Noriega & Castro, Dr. Roberto Aleman, a member of the firm of Icaza, Gonzalez-Ruiz y Aleman, Dr. Jorge Fabrega Ponce, a professor of procedural law at the University of Panama, Dr. Eduardo Alfaro, an attorney and a banker, Bartley Paul Smith Alegre, a banker, and Eduardo A. Masferrer, a professor of banking and business administration at Nova University, Panama Center.

From these sources a number of conclusions of both a legal and factual nature can

be derived. Panama is a civil law country which traces its legal system back to the Spanish Civil and Commercial Codes. Its law consists primarily of the Constitution and various statutes and decrees and the principles of *stare decisis* apply only in circumstances not relevant here, that is, with respect to constitutional issues. Supreme Court decisions are not binding and create "probable doctrine" only after three decisions on the same issue. Even "probable doctrine" does not require the same result in later cases.

The Panamanian statutes are divided into codes that deal with particular legal concerns. The Civil Code of Panama is its organic law and has the broadest applicability. The Commercial Code regulates commercial transactions and those matters where its provisions are inconsistent with the Civil Code. The Judicial Code provides rules for applying the results required by the Civil and Commercial Codes, among others, in court.

Each Code provides rules for interpreting and applying its provisions. As a general rule, however, these laws must be construed in their natural sense and govern a particular situation if the language clearly applies. "When the sense of the law is clear, its literal meaning shall not be disregarded on the pretext of consulting its spirit." Civil Code, Article 9. If there is no applicable law, or if the laws are in conflict or are ambiguous, Panamanian law permits reference to analogous provisions or commercial practices.

More generally, Panama, with well over 100 banks located in Panama City, is a major world banking center, and a key location in the world's money management flow. An important factor in this activity is the liberality of its corporation laws and the anonymity Panamanian law permits to the owners of Panamanian corporations and the owners of the assets of those corporations, including anonymity from foreign governmental authorities. There is substantial competition between Panamanian banks for foreign funds generated by offshore corporations, and more of the funds in the Panamanian banking system are derived from non-Panamanian sources than from local deposits. Such foreign financial sources contribute significant revenues both to Panama as a country and to the banks in Panama. These facts lead inexorably to the conclusion that the Panamanian law and procedures assist those who seek to minimize the tax consequences of their fiscal affairs, and it is equally appropriate to infer that the principals of Olmeca had such goals.

The Panamanian Ministry of Foreign Affairs appoints Consuls in foreign countries to assist with Panamanian commercial and governmental matters with various powers, including the authority to notarize or authenticate documents. The consul has the duty "to authenticate signatures and foreign legal instruments intended to have legal effect in Panama." (Article 174(i) of Decree No. 10, the Organic Law on Foreign Affairs), as well as the duty to serve as Notary Public, Article 147(g). The fees for authentication and notarization are different, as are the processes.

Notarization requires two witnesses and results in a particular stamp and form of document. In Panama there are between 15 and 20 notaries who are public officials, of whom 4–5 are in Panama City. In addition to serving as notaries, they protocolize documents, that is, determine that they are in proper form, place them on file and issue authorized copies as Escritura. Any person can offer a document to a notary for protocolization. The filings with a notary are public but unpublished.

A document once protocolized may also be placed in the Public Register by the corporate president, secretary or resident agent or officer appointed for this purpose. The Public Register is just that, and its filings are recorded, published and centrally indexed. The Public Registrar has the qualifications of a Panamanian Supreme Court Justice.

These facts and authorities present two principal issues; the propriety of the consular authentication of the Minutes and the effect to be given to the authentication and

subsequent protocolization and notarization of the Minutes.

## Authentication

Escritura No. 1515 was authenticated by the Panamanian Consul in Morocco, protocolized in Panama, authenticated by the United States Consul in Panama, and relied upon by MHT in New York. The parties vigorously dispute the form and effect of the authentication undertaken by the Moroccan Consul. MHT contends that under Panamanian law, an authenticated power is "presumed" valid, and that the authentication at issue is in the customary form for such a document. Olmeca contends that a consular authentication is simply an administrative act which confers no presumption of validity upon the signatures to a document, and that such a presumption arises only when the consul is acting in a notarial capacity or the document is granted pursuant to the legal requirements of a foreign country.

As to the propriety of the form of authentication, neither Olmeca nor MHT could identify a code provision which specified the proper form or what the appropriate representations of the Consul should be. Here the consular authentication stated, inaccurately as it turned out:

### CERTIFICATIONS

The undersigned Consul General of the Republic of Panama in Casablanca herewith certifies that the foregoing signature consisting of the name Mr. ANDRE GAZANIOL, who at present holds the office of President of OLMECA, S.A., a Panamanian corporation, is genuine.

Casablanca, January 15, 1981

Signed: MARIA TERESA GAUTHE[Y], Consul General of Panama.

MHT witnesses testified that the authentication was in the customary form. Olmeca's witness testified he could not be certain whether the consul sought to authenticate or notarize and that it would be a question of what was in the consul's mind. All agree, however, that as a notarial act

the certificate was ineffective, lacking the two required witnesses.

■ In the absence of any Panamanian authority as to the proper content of an authentication, a comparison to the practice customarily employed in this jurisdiction is helpful. Generally, the actor who appears before a notary and swears that he is who he purports to be, followed by the authentication of the notary's signature by the appropriate local official, whose signature is then authenticated by the consul of the country in which the document is sought to be made effective. *See Morgan Guaranty Co. v. Hellenic*, 621 F.Supp. 198 (S.D.N.Y. 1985). A consular officer may take the oath, 22 U.S.C. § 4215, or may make the authentication, 22 C.F.R. §§ 92.36, 92.37.

The Panamanian Consul in Morocco, however, certified to the substantive genuineness of the signature rather than confirming the purported identification of the person signing the Minutes. Clearly as an authentication, the Moroccan Consul attested to a fact which she could not have known, as neither Andre Gazaniol nor Claude Renisio appeared before her to sign the Minutes or attest to their signatures. Had the Consul had been performing a notarial act, that is, one which goes to the substantive validity of the document, it would have been proper to attest to the genuineness of the signatures in the presence of two witnesses. Indeed, it is just such a distinction upon which presumptive effect may turn. Although MHT contends that authentication has an "accepted meaning throughout the world", in my view MHT has failed to establish that there is relevant Panamanian law governing the form and substance of a Consular authentication.

Article 5 of the Commercial Code provides that in the absence of any controlling code provision whatsoever, the court may look to relevant Panamanian commercial practice to determine the customary or proper form of an authentication. It provides:

If questions concerning commercial rights cannot be settled either by the

text of the commercial law or by its spirit or by analogous cases stipulated in it, they shall be decided in accordance with the general usages generally observed on each marketplace; and in the absence of such usages, in accordance with what is established by the civil law.

Here the witnesses are in dispute but Dr. Castro, MHT's expert, testified that authentication of a signature meant identification of the signatory in a fashion appropriate to the country in which the consul was located. Dr. Aleman testified that he understood authentication to be a signature before the consul or an acknowledgment by those present that the signatures were theirs. Neither statement is contained in the authentication presented here.

■ All witnesses testified that the authentication, if that's what it was, was in the customary form. However, the statement here in the certification appears meaningless against this background. That the signatures are genuine may mean no more than signed in the presence of the consul, with or without identification of the signatory or an oath as to his identification and capacity. The form, as the facts here demonstrate, is meaningless and without effect.

Whatever its form, the parties also dispute the legal effect under Panamanian law of a properly authenticated power of attorney. While it is undisputed that under Article 2(8) of the Commercial Code powers of attorney are considered "acts of commerce" governed by that Code, the Commercial Code provides no guidance on the substantive effect of an authentication, triggering this court's authority under Article 5 of the Commercial Code to use these analogous provisions of the Judicial Code as interpretive principles.

It is MHT's belief that Articles 431 and 912 of the Judicial Code, which governs the application of substantive laws in court, operate together to grant a presumption of validity to documents presented in authenticated form. Article 431 states:

Powers of attorney which are granted in a foreign nation before an authority thereof to be exercised in Panama must be issued in accordance with the formalities required at the place where they are granted; however, they must furthermore be authenticated by the Diplomatic or Consular agent of Panama residing at said place.

Article 413 therefore reinforces what experience teaches is the common method of authentication, the performing of an act before a foreign official followed by an authentication by the Consul that the foreign official is authorized to perform such functions and could act in this capacity. MHT contends that Article 431 provides the prerequisite form of identification required for a document to obtain presumptive validity in a Panamanian court under Article 912:

Documents issued in foreign countries shall be [deemed] as proof, depending on the individual's case, and, if presented in authenticated form, with respect to powers of attorney, as stipulated in Article 431 of this Code.

Therefore, these code provisions indicate that an authentication, unspecified as to form, shall be "deemed as proof" or "presumed valid" or "admitted as proof," the latter phrase being a less favored translation.

Olmeca's witnesses contend that this reading of Judicial Code Articles 912 and 431 assert that regardless of the form of the authentication, it is insufficient to support a legal presumption of validity, as Articles 912 and 431 grants presumptive validity *only* to powers granted before a foreign authority, which Escritura 1515 was not. These formalities of foreign execution, according to Professor Fabrega (at 304–305), substitute for the notarial requirement of the presence of two witnesses and entitle the document to presumptive validity under Articles 431 and 912. *See also* Civil Code, Article 1730 ("the attestations which the notaries make at the foot of a private instrument in the presence of two witnesses shall enjoy full faith and credit").

This construction of Article 912 and 431 appears strained. Article 431 does not state that such powers must be granted by a foreign authority, but only that they must be "issued in accordance with the formalities required at the place where they are granted." Furthermore, Article 432 of the Judicial Code provides that a document authenticated under Article 431 is, in the absence of proof to the contrary, presumed to have been issued in accordance with these formalities:

> As a result of the fact that they are authenticated in this way, it is presumed that the powers are issued in accordance with the local law of the place of their origin, unless an interested party proves otherwise.

While no evidence of Moroccan authentication requirements was offered at the hearing, there is no evidence to suggest that these powers were granted before an authority of the foreign nation. Under these circumstances, the presumption in Article 432 defeats Olmeca's reading of the requirements in Articles 431 and 912.

However, even assuming the authentication of the Minutes is in proper form, the question is still presented whether "deemed as proof" or "presumed valid" under the Judicial Code constitutes an irrebuttable presumption. The language does not by its terms so suggest. A presumption of validity for purposes of proof is not demonstrated to be irrebuttable—or as Olmeca puts it—an authentication cannot convert a forgery into a genuine document, and no authority except for public registration, to be discussed below, so provides.

**Protocolization**

Subsequent to their authentication by the Panamanian Consul in Morocco, the Minutes were protocolized by presentation, recordation and filing with the Fourth Notary in Panama City. The parties have stipulated that although it was protocolized, it was never entered into the Public Registry (as powers of attorney may be pursuant to Civil Code Article 1131(5) and Commercial Code Article 57(7)), and was placed in the files of the Fourth Notary as "public document."

The parties do not dispute that had the Escritura been placed in the Public Registry, it would have been totally effective in protecting MHT from the risks of relying on the document. As Article 1791 of the Civil Code provides:

> None of the instruments establishing title which are subject to registration or recording in accordance with the above provisions, shall merit public faith in court or before any public authority, employee or official if it has not been registered in the public register....

*See also* Commercial Code Article 67 (only documents filed in the Public Register have legal effectiveness against third parties).

While MHT concedes that Public Registration affords complete protection for reliance, MHT contends that protocolization in and of itself, particularly in light of its performance by Olmeca's resident agent, gives the Escritura a "presumption of validity" upon which it was entitled to rely, even without the benefit of Registration. It cannot be contended that the protocolization of a forged document converts the Escritura into a genuine power of attorney. As Civil Code Article 1751 illustrates:

> The document officially protocolized by a notary public does not acquire any greater effectiveness than it had originally, since the purpose of this measure is merely to safeguard and secure the custody of the protocolized document.

MHT nevertheless argues that protocolization does afford special protection and is presumptively valid, relying on *Ord. de Alba-Paniza*, P.T.S. Vol. I 1952 for the proposition that:

> [t]he party who affirms the falsity of a public document has the burden of the proof, in view of the fact that such, due to the solemnity with which they are clothed as a result of the intervention of the state through an official, for the purpose indicated, they enjoy a presumption of validity.

However, reliance on a concept of "juridical appearance" does little to advance

MHT's arguments that the protocolization enhances the validity of that document under Panamanian law, as protocolization itself is performed by a resident agent who is empowered to perform only ministerial acts. Decree No. 130 of 1945, Art. 2. Section 3. While Dr. Pedreschi had the power to protocolize the document to create an appearance of regularity, he cannot bind Olmeca to a document which is a forgery. As provided in Decree No. 130 of 1945, Art. 1, the Escritura issued by the notary pursuant to protocolization has the same legal effect as the document recorded, and does not gain a special presumption by virtue of the ministerial act of protocolization.

MHT also appears to contend that the protocolization by the resident agent constitutes the sort of representation or estoppel that produced the result in *Alberto Mizrachi Y Cia Ltd.*, Supreme Court of Panama, 1947 ("Mizrachi"). *Mizrachi*, which has not achieved the status of "probable doctrine," appears to be a "sport" in Panamanian jurisprudence and to the extent it has any common law weight, it is distinguishable. There an unregistered contract was sought to be invoked to avoid a liability established by acceptance of goods from a supplier by Mizrachi destined for another's undisclosed use. The unregistered contract failed to give Mizrachi any protection. MHT seeks to extend this holding to this unregistered power of attorney by claiming a right to rely on the acts of the resident agent. Leaving aside the considerable debate as to significance of the resident agent which ranges from a mere minister for the purpose of producing revenue for the benefit of the Panamanian bar to an authorized officer of the company, the protocolization does not constitute the direct representation found in *Mizrachi*. Whatever evidentiary or inferential effect the protocolizaton of a resident agent, in and of itself, may have, there is no entitlement under Panamanian law for an absolute defense arising out of the protocolization of the document.

MHT does correctly point out, however, that the shield of public registration cannot be used as a sword. Although powers of attorney are subject to registration under Article 57(7) of the Commercial Code. Article 68 provides:

INSTRUMENTS NOT BINDING ON THIRD PARTIES

Article 68. Documents or contracts of any kind which are subject to recording and which lack this prerequisite shall be binding between the parties thereto but they cannot be used to the prejudice of a third party, who, however, may base himself on them insofar as they are favorable to him.

Putting it differently, by failing to register the registrable power of attorney, the parties cannot invalidate it as to a third party who may act on it if the document is favorable to him, which is, of course, just what MHT did. However, there is nothing in the Code which provides that reliance will create an irrebuttable presumption of validity. While the parties to the document who fail to register cannot invoke that failure to the injury of MHT, as the testimony of MHT's expert established, neither does the lack of registration grant it any affirmative protection, particularly as to Olmeca, which was by stipulation also a third party to the Minutes.

Considerable testimony from credible witnesses established that while exceptions may exist, as a matter of commercial practice, banks act on powers of attorney without registration or the protection granted by the notice provisions of the Public Registry. The primary reason for non-registration is confidentiality. By the operation of Article 5 of the Commercial Code, MHT would seek to elevate this practice into *de facto* registration with the same effect. Civil Code Article 1753 states that one of the purposes for registration is "to impart greater guarantees of authenticity and security to documents, ... which must be registered." This third party protection derived from registration would be superfluous if the same protection could be obtained without registration. The elaborate mechanism of the Public Registry would cease to perform its notice function and

would be redundant, an unlikely construction of Panamanian law.

In sum, Panamanian law does not give the authenticated power of attorney at issue an irrebuttable presumption of validity, does not provide a defense to MHT in this action.

IT IS SO ORDERED.