**Mahmoud FUSTOK, Plaintiff,**

v.

**CONTICOMMODITY SERVICES, INC., Norton Waltuch, Tom Waldeck, and Ivan Auer, Defendants.**

**No. 82 Civ. 1538(MEL).**

United States District Court, S.D. New York.

Jan. 10, 1984.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for plaintiff; Herbert Stoller, Peter Fleming, Jr., Eliot Lauer, Peter W. Lavigne, Michael Zimmerman, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, Sheldon L. Berens, New York City, Glen F. Hackmann, Philip T. Powers, Chicago, Ill., for defendants; Arthur L. Liman, Mark H. Alcott, Richard A. Rosen, Diane Englander, Peter W. Schneider, New York City, of counsel.

LASKER, District Judge.

## I.

In this action, which arises out of the collapse of the silver market in the spring of 1980, defendants move pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for summary judgment. The motion is denied.

The plaintiff, Mahmoud Fustok ("Fustok") is a wealthy Saudi Arabian business-

man and investor.[1] Defendant Conticommodity Services, Inc. ("Conti"), is a commodities broker registered with the Commodities Futures Trading Commission and is a member of various exchanges including the Commodity Exchange, Inc. ("Comex"). The individual defendants, Norton Waltuch, Tom Waldeck, and Ivan Auer, were officers of Conti during the period at issue in this action.

In 1976 Fustok became acquainted with Antoine Asfour, Jean Jacques Bally, and Pierre Alain Hirschi, who were then employed with the Geneva branch of the Chase Manhattan Bank. In 1978 Asfour, Bally and Hirschi, having left the bank's employ, established an investment advisory company in Switzerland, Advicorp Advisory and Financial Corporation, S.A. ("Advicorp"). Fustok provided capital for Advicorp, and in June 1978 executed a mandate authorizing Advicorp to direct the investment of funds held in an account Fustok opened at Banque Populaire Suisse ("BPS"),[2] which held a 20% stock interest in Advicorp. BPS also designated one of Advicorp's directors.[3]

In August 1979, by which time Fustok had transferred about $23 million to his BPS account, Fustok instructed Advicorp to purchase silver for his BPS account, and transferred additional funds to his account for that purpose. The amount Fustok authorized Advicorp to purchase is a matter of dispute, but it is agreed that Fustok authorized purchases of at least $30 to $40 million worth of silver.[4] The purchases were initially made through accounts which BPS opened in its own name with Conti and other futures commission merchants. Through these so-called "omnibus" accounts, commodities and commodity futures contracts were traded for the account of various BPS customers including Fustok. BPS authorized Advicorp to trade the omnibus account which was opened at Conti.

In November 1979, Fustok signed papers, at Advicorp's request, establishing an account with Conti in his own name (hereinafter, the "055 account").[5] It is the trading in this account which is the subject of the complaint. The facts as to the trading of the 055 account between November 1979 and March 1980, and in particular as to Fustok's knowledge of and responsibility for the trading that took place, are sharply disputed by the parties. It is not questioned, however, that in late March 1980 an enormous and rapid decline in silver prices prompted margin calls of tens of millions of dollars on Fustok's account. On March 26, 1980, when Conti requested the margin funds from Fustok's representatives, the 055 account held open futures contracts and silver depositary receipts representing more than five million ounces of silver. Fustok denied responsibility for the account, contending that any trading in the 055 account had been completely unauthorized. Thereafter, intense negotiations between Fustok and Conti took place with respect to the account, Fustok attempting to prevent Conti from liquidating the account and Conti attempting to obtain Fustok's agreement to assume responsibility for the transactions that had taken place in the account.

When the account was eventually closed in October 1980, a positive balance of approximately $2 million remained, out of the approximately $70 million of Fustok's funds that Fustok alleges were used without his authorization in trading the account. The $2 million positive balance was remitted to Fustok. The complaint seeks recovery of the approximately $68

---

1. Unless otherwise indicated, the facts set forth here are undisputed for the purposes of this motion.

2. Def.Ex. 16. The exhibits submitted in connection with this motion will be referred to as "Pl.Ex. _____" or "Def.Ex. _____."

3. Pl.Ex. 1.

4. Affidavit of Mahmoud Fustok dated March 25, 1983, ¶¶ 3, 4. ("Fustok Aff.").

5. The Conti account opened in Fustok's name was assigned account numbers 38055 (for trades on Comex) and ONO55 (for trades on the London Metals Exchange, Inc.).

million difference, alleging unauthorized trading, conversion, and violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* and CFTC regulations.

Substantial discovery has been completed, and the defendants contend that Fustok's admissions together with documentary evidence establish that as a matter of law Fustok is estopped from denying that the transactions in the 055 account were authorized by him. Defendants assert that the following facts are conclusively established by the record:

Fustok signed documents opening the 055 account with Conti; these documents included a "risk disclosure statement" which Fustok signed describing the risks of speculating in commodities futures, as well as a customer agreement reciting that all transactions would be reflected in confirmation slips mailed to an address designated by Fustok and that such confirmations would be binding if not objected to within ten days.

Confirmation slips and monthly account statements were in fact mailed to the London address designated in the agreement.

Fustok made Advicorp his agent for overseeing the investment of funds in his BPS account, as evidenced in particular by the mandate executed by Fustok in 1978.

Fustok delegated to Advicorp the responsibility of receiving mail sent to Fustok's London office, as well as for obtaining bank statements from BPS pertaining to Fustok's BPS account.

Asfour reported to Fustok periodically on the status of his BPS account.

Neither Fustok nor Advicorp protested any of the transactions in the 055 account until silver prices began to drop in March 1980.[6]

Defendants contend that as a matter of law the receipt of confirmations without protest precludes Fustok from claiming that the transactions were unauthorized.[7] They also argue that, even assuming Fustok was personally unaware of the details of the transactions, Advicorp was Fustok's agent with respect to silver transactions and Fustok is therefore bound by Advicorp's handling of the account and its failure to protest any of the transactions reflected in the confirmation slips.[8]

Fustok responds that he did not authorize any trading in the 055 account. He asserts that he signed the documents opening the 055 account at Asfour's request without reading them, and that Asfour told him that the opening of a Conti account in Fustok's name was required simply to enable BPS to take delivery of the physical silver which was purchased for Fustok's BPS account. Fustok contends that the mandate he executed in 1978 gave Advicorp authority only to manage his BPS account, and that the silver purchases he directed Advicorp to make were to be made only through BPS. Moreover, Fustok asserts he authorized Advicorp to purchase only $30 to $40 million worth of silver and the purchases were to be made only of physical silver, not of futures contracts.[9] He claims that he never saw the confirmations that were mailed to his London address,[10] and that Conti mailed them to his

---

6. Record references for these assertions are as follows: Def.Ex. 53; Def.Exs. 4, 58; Def.Ex. 16; Fustok Deposition ("Fustok Dep.") pp. 55, 60–65, 69; Fustok Aff. ¶ 6.

7. *See Ocrant v. Dean Witter & Co. Inc.,* 502 F.2d 854, 858–59 (10th Cir.1974); *Architectural League v. Bartos,* 404 F.Supp. 304, 313 (S.D.N.Y. 1975).

8. *See Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 609 F.2d 1047, 1051–52 (2d Cir.1979); *Corporacion de Mercadeo Agricola,* 608 F.2d 43, 46 (2d Cir.1979).

9. The facts recited above are set forth in ¶¶ 1–6, Fustok Aff.

10. Fustok Aff., ¶ 13. Although Fustok has attempted to argue that the confirmations may not have been mailed to the London address at all, he has offered no evidence to refute the deposition testimony of the two Conti employees responsible for the mailings, Kathleen McCaffrey and Ellen Sauerbier, to the effect that ordinary procedures were followed in mailing the confirmations. Indeed, Fustok has produced the confirmations in discovery. Under these circumstances, no issue of fact remains as

London office knowing that Asfour would "intercept" them and conceal them from Fustok. Indeed, Fustok asserts that Conti conspired with Asfour to use Fustok's funds without his knowledge in order to trade the 055 account for their own benefit. These benefits included, according to Fustok, the substantial commissions received by Conti for trading the account, and the rising silver prices which allegedly resulted in part from the massive trading carried out with Fustok's funds and which helped generate profits for the principals of Advicorp and the individual defendants, who engaged in substantial trading for their own accounts during the period in question.[11]

As evidence that Conti knew that Advicorp was not authorized to trade the 055 account, Fustok cites Conti's internal records which fail to indicate that the account was discretionary and show instead that only Fustok himself was authorized to trade the account.[12] The defendants concede that Fustok did not, in fact, do so. Fustok also cites Conti's alleged failure to observe its own rules and CFTC regulations for the handling of discretionary accounts as evidence of devious behavior indicating that Conti knew the account was not discretionary.[13] If the defendants knew that the trading in the 055 account was unauthorized, Fustok argues, then they did not rely upon any apparent authority possessed by Advicorp with respect to

Fustok's affairs, and cannot assert a defense of estoppel against his claims.

■■■ The parties' submissions on the instant motion are voluminous, if not staggering.[14] However, although the documentation is formidable, the legal principles governing this motion are relatively straightforward. First, the defendants correctly state the law in contending that a party who has failed to read a contract which he has signed cannot rely upon his own negligence to escape liability for his contractual obligations, absent fraud or misconduct by the other party to the contract.[15] This rule is consistent with the more general principle of equitable estoppel, which "prevents one from denying his own expressed or implied admission which has in good faith been adopted and acted upon by the other." [16] As to the issue whether Fustok is bound by Advicorp's receipt of confirmations, the relevant rule is that, when a principal has invested an agent with authority over his affairs, "notice to the agent ... is notice to the principal, unless the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal." [17]

■■■ Hence, if there were no dispute that the defendants had in good faith relied upon Fustok's signing of the account documents and Advicorp's apparent authority over Fustok's silver investments, Fustok's

---

to the mailing of the confirmations. *See Roto-Lith, Ltd. v. F.P. Bartlett & Co.,* 297 F.2d 497, 498 (1st Cir.1962).

**11.** *See* Pl.Exs. 14, 16.

**12.** *See* Pl.Ex. 22.

**13.** *See* Pl.Mem. at pp. 43–46 and record references cited therein.

**14.** The three memoranda of law alone comprise close to 250 pages, but are many times outweighed by the exhibits and deposition transcripts filed in connection with the motion.

**15.** *See Gaskin v. Stumm Handel GmbH,* 390 F.Supp. 361 (S.D.N.Y.1975).

**16.** *Stutelberg v. Farrell Lines, Inc.,* 529 F.Supp. 566, 569 (S.D.N.Y.), *aff'd mem.,* 697 F.2d 297 (2d Cir.1982); *see also Matter of Pubs, Inc. of*

*Champaign,* 618 F.2d 432 (7th Cir.1980). The defendants have suggested that federal common law is applicable because the complaint is predicated in part upon alleged violations of a federal statute (the Commodity Exchange Act). They further argue that if state law were relevant to the complaint's common law claims, Illinois rather than New York law would apply because the Customer Agreement provides for application of Illinois law to the agreement. Def.Ex. 53. We need not decide the question, since none of the parties has suggested that there is any material difference between Illinois, New York, and federal common law on the points at issue here.

**17.** *Corporacion de Mercadeo Agricola v. Mellon Bank, supra,* 608 F.2d at 46.

conclusory assertions that he did not authorize trading in the 055 account would not prevent the dismissal of his complaint. However, a common thread among the principles of contract, estoppel and agency law cited above is that they are not available as a defense to a claim of unauthorized trading if the defendants were actually aware that the agent was acting beyond its authority with respect to the account.[18] Fustok's position is that he authorized only $30 to $40 million in silver purchases, that this authorization did not include futures trading, that his signature on the documents opening the 055 account was obtained by misleading and/or incomplete representations by Asfour, and that he did not receive any confirmations of transactions in the 055 account. He argues that the defendants were aware he was not receiving the confirmations personally and that they knew or had reason to know that Advicorp's trading was unauthorized.

■ The question on this motion, of course, is not whether Fustok's evidence on these points is conclusive, but whether, drawing all reasonable inferences in favor of Fustok, the evidence of record raises an issue of fact for trial. For several reasons, we conclude that it does. First, the mandate which Fustok executed in favor of Advicorp for the management of his BPS account, upon which defendants say they relied in permitting Advicorp to trade the 055 account for Fustok, was executed nearly a year and a half prior to the opening of the 055 account. The mandate, of course, does not on its face authorize Advicorp to trade the 055 account, nor does it authorize commodity futures trading at all. Moreover, according to Conti's own Manual of Policies and Procedures the mandate appears inadequate to permit Conti to accept orders for the account from Advicorp. Instead, according to the Manual, Conti should have had on file both a "Trading Authorization" signed by Fustok and Advicorp and "Letter of Assurance" signed by Fustok (which emphasizes the risk of granting a trading authorization).[19] Defendants do not dispute that none of Conti's internal records, except for the 1978 mandate, reflect that anyone other than Fustok himself was authorized to trade the account. Indeed, it appears that the account was originally opened on Conti's records as a discretionary account with trading authority granted to Waltuch, Waldeck and Auer (not to Advicorp), but that the reference to the account being discretionary was deleted from Conti's records on November 23, 1979 and the account was thereafter carried on Conti's records as being traded only by Fustok.[20]

Fustok has also offered excerpts from Waltuch's testimony given on November 19, 1979 in a Comex investigation in which Waltuch failed to identify Fustok's account as one for which Advicorp had trading authority, although the first trades for the 055 account had been executed on November 14th.[21] Finally, Waltuch and Waldeck maintained accounts with Conti in their own names during the period in question, and the Advicorp principals maintained an account with Conti in the name of a Panamanian corporation, Gillion Financial, Inc.[22] An inference is possible that because they stood to gain from rising silver prices that might follow in part from the huge purchases being made with Fustok's funds, and because in any event Conti benefited from the huge commissions generated by the trading of the 055 account, the defendants permitted Advicorp to trade beyond its authorization.

None of these matters—the incompleteness or inconsistency of Conti's records, its failure to follow established policies and

18. *See* in addition to the above citations, Restatement of Agency (Second), § 166 (1958):
"A person with notice of a limitation of an agent's authority cannot subject the principal to liability upon a transaction with the agent if he should know that the agent is acting improperly."

19. Pl.Ex. 65.

20. Pl.Ex. 64.

21. *See* Pl.Ex. 52 at 211; Pl.Ex. 20.

22. *See* Pl.Exs. 13, 14, 16.

procedures, Waltuch's testimony, and the possible motive for permitting unauthorized trading—provides proof that defendants were aware of limits on Advicorp's authority and chose to ignore them. Nonetheless, they do provide a possible basis for such an inference, and it is worth noting that the mountain of paper that has been submitted on this motion does not include affidavits from any of the individual defendants stating the nature of their understanding of the scope of Advicorp's authority with respect to the 055 account. In view of the questions raised by Fustok's submissions, a triable issue of fact exists as to the defendants' actual reliance upon Advicorp's authority with respect to the 055 account, and their knowledge or lack of knowledge of the extent and limits (if any) of Advicorp's authority.

## II.

Defendants' motion for summary judgment is also predicated on the assertion that, in the course of negotiations following Conti's margin call in late March 1980, Fustok compromised and relinquished his claim against Conti, or in the alternative that his conduct amounted to ratification of the trades in the 055 account and waiver of his unauthorized trading claim. As to all of these defendants, however, issues of fact clearly exist which preclude summary judgment.

■ Of course, an agreement to compromise and settle a claim, oral or written, may be enforced as any other contract.[23] Defendants' reliance on cases reciting this principle is misplaced, however, since it must first be determined whether as a matter of law such an agreement was reached between the parties.

■ Defendants' assertions as to Fustok's alleged compromise of his claim are as follows: When Conti made its margin call of March 26, 1980, Fustok challenged the legality of the transactions in the 055 account and disclaimed any responsibility for them. Conti told Fustok that the account was his and threatened to liquidate the silver in the account if margin was not provided. Instead of adhering strictly to his position that he had nothing to do with the account—which, according to defendants, would have required Fustok to permit Conti to liquidate the silver and thereafter sue Fustok for the deficit that would have resulted—Fustok negotiated with Conti in an attempt to prevent liquidation. According to Conti, Fustok's attempt to prevent liquidation of the account compels the conclusion that he accepted responsibility for the account and relinquished any claim of unauthorized trading. The consideration furnished by Conti for Fustok's agreement to compromise the claim, defendants contend, was Conti's deferral of its threatened immediate liquidation; the account instead was liquidated over a period of several months.

The record, however, does not support the conclusion that no issue of fact remains as to whether Fustok compromised and relinquished his claim. Fustok asserts that, despite the negotiations that took place, he never reached a firm agreement with Conti. He contends that, although he attempted to obtain Conti's agreement to refrain from liquidating the account by offering to take responsibility for the transactions if Conti would defer liquidation, Conti in fact proceeded to liquidate large amounts of silver over his objections.[24] Such liquidations occurred on May 14th, 20th, 28th and 29th, 1980.[25] Thereafter, Fustok's representatives directed further liquidations of the account because, Fustok contends, Conti had made clear its intent to liquidate and Fustok wished to minimize losses to the account by proceeding with the liquidation in an orderly fashion.[26] Fustok also relies on the following documentation of the parties' failure to resolve their differences: a telex dated April 23rd, to Fustok from Wal-

**23.** *See Strange v. Gulf & South Am. Steamship Co., Inc.,* 495 F.2d 1235 (5th Cir.1974).

**24.** Fustok Aff., ¶¶ 15–20.

**25.** Pl.Exs. 46, 48, 49, 75, 106.

**26.** *See* Fustok Dep. at 640–44.

ter Goldschmidt, Conti's president, making a $7.7 million margin demand and stating "this demand reserves all claims and rights Conti has in respect to your account;"[27] a letter agreement drafted by Conti's counsel in early May which was never signed;[28] a June 5, 1980 letter by Conti's counsel transmitting a draft of a settlement agreement to Fustok's counsel, stating "[Conti] is still not certain whether it wants to enter into an agreement along those lines."[29] It is undisputed that no written agreement was ever signed.

Fustok contends that his attempt to avoid liquidation, at the extremely low prices that prevailed in the spring of 1980, of silver and silver contracts purchased with $70 million of his funds, reflects simply an attempt to minimize losses under chaotic market conditions and not a surrender of his right to challenge the transactions at a later date. In light of the documentary evidence discussed above, as well as the assertions contained in Fustok's affidavit,[30] Fustok's characterization of the events in question cannot be rejected as a matter of law. Rather, Fustok's submissions raise a genuine issue of material fact as to whether a settlement agreement was ever reached,[31] and, if so, whether the agreement was nevertheless not intended to be binding unless reduced to writing.[32]

The additional defenses of ratification and waiver asserted by the defendants are factually related to their defense of compromise and settlement, and are also not susceptible of resolution on a motion for summary judgment. As stated in *Breen Air Freight, Ltd. v. Air Cargo, Inc.:*[33]

> "Under the law of agency ratification can only occur when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it."

Whether Fustok's negotiations with Conti and his attempt to prevent liquidation of the account constituted an intent to ratify the transactions in the account, or whether he instead intended to preserve his legal rights against Conti, cannot be resolved on the current record. The defense of waiver, which "is generally defined as an intentional relinquishment of a known right,"[34] depends upon resolution of the same issue.

For the foregoing reasons, the motion for summary judgment is denied.

It is so ordered.

---

**27.** Pl.Ex. 99.

**28.** Pl.Ex. 103.

**29.** Pl.Ex. 105.

**30.** Defendants point out an apparent contradiction between the assertion in Fustok's affidavit that his acceptance of responsibility for the transactions was conditioned upon Conti's agreement not to liquidate, and assertions in his deposition that he took responsibility for the account at Conti's insistence. *E.g.,* Fustok Dep. at 572–74. However, this is not one of those rare instances in which the assertions in an affidavit are so blatantly contradictory of those in a prior deposition that the affidavit must be disregarded in determining the appropriateness of summary judgment. *Cf. Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572 (2d Cir. 1969). Fustok's explanation of his deposition statements—that his acceptance of responsibility for the account was limited to an attempt to minimize losses and was not intended as a relinquishment of his legal rights unless Conti agreed not to liquidate the account—is not so inherently incredible that it must be disregarded.

**31.** *See Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673 (2d Cir.1972) (where facts are in dispute as to existence of agreement, matter must be determined at trial).

**32.** *See Chromalloy American Corp. v. Universal Housing Systems of America, Inc.,* 495 F.Supp. 544, 550 (S.D.N.Y.1980), *aff'd mem.,* 697 F.2d 289 (2d Cir.1982) (whether parties intended to be bound only by a written agreement is issue of fact for trial).

**33.** 470 F.2d 767, 773 (2d Cir.1972).

**34.** *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367, 370 (7th Cir.1978).