**In re ADIRONDACK RAILWAY CORPORATION, Debtor.**

**Victor T. EHRE, Sr., Trustee in Reorganization for the Estate of Adirondack Railway Corporation, Plaintiff,**

v.

**PEOPLE OF the STATE OF NEW YORK by William C. HENNESSY, as Commissioner of the New York State Department of Transportation, Defendant.**

Misc. No. 1976.

United States District Court, N.D. New York.

March 16, 1988.

See also, Bkrtcy., 95 B.R. 9.

Hancock & Estabrook, Syracuse, N.Y., for trustee; Thomas C. Buckel, Jr., of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Dept. of Law, Albany, N.Y., for the People of the State of New York; Edward M. Scher, Asst. Atty. Gen., of counsel.

Brett W. Martin, Utica, N.Y., for Helmers Fuel & Trucking, Jil Lindenmeyr and Track Works, Inc.

Joseph C. Davidson, Jr., Albany, N.Y., for New York State Dept. of Transp.

Menter, Rudin & Trivelpiece, P.C., Syracuse, N.Y., for Chase Lincoln Bank; Edward M. Zachary, of counsel.

Rossi, Kehoe, Murnane & Hughes, Utica, N.Y., for Chester Jajo; Thomas P. Hughes, of counsel.

ORDER

MUNSON, Chief Judge.

This matter is before the court upon the request of Victor T. Ehre, Sr., Trustee in Reorganization for the Estate of the Adirondack Railway Corporation, to approve the compromise, settlement and discontinuance of the Trustee's complaint against

the State of New York. Bankruptcy Judge Stephen D. Gerling has issued proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).

Following a review of the record in this case and no objections having been filed, the court hereby adopts the well-reasoned memorandum decision of Judge Gerling and it is

Ordered that:

1. The Trustee's application to compromise, settle and discontinue the adversary proceeding is denied.

2. The Trustee and the State of New York are to resume the trial of the adversary proceeding within thirty (30) days of the date of the entry of this Order or at the discretion of the Bankruptcy Court.

3. The hearing of the contested matter, in which the State of New York seeks a rejection of the Lease Agreement and damages for waste, shall be rescheduled by the Bankruptcy Court pending completion of the adversary proceeding.

## PROPOSED MEMORANDUM–DECISION, FINDINGS OF FACT CONCLUSIONS OF LAW AND PROPOSED ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

The Court has been asked by Victor T. Ehre, Sr., Trustee in Reorganization for the Estate of the Adirondack Railway Corporation ("Debtor") to approve the compromise, settlement and discontinuance of the Trustee's complaint against the State of New York ("State"), directing the Trustee to accept the sum of $200,000.00 in return for the Trustee's execution of certain documentation to include the termination of Debtor's rights in a certain "railroad right-of-way Lease Agreement" ("Lease Agreement").

The Trustee's application to the Court, notice of which was duly given to all of the Debtor's scheduled creditors, emanates from an adversary proceeding commenced by the Trustee against the State on or about October 7, 1982.[1] The Trustee initially alleged four causes of action: 1) a declaratory judgment with respect to Debtor's thirty-year lease of the State's rail right-of-way between Remsen and Lake Placid, New York; 2) for work performed and services furnished by Debtor in connection with the rehabilitation of said railroad line; 3) fraud, deceit and misrepresentation; and 4) unjust enrichment. The second cause of action or "extra work" claim sought to recover $972,753.00 and was based on four amendments to a November 29, 1977 contract between Debtor and the New York State Department of Transportation ("DOT") executed between July 1979 and October 1980. The rehabilitation was deemed necessary by the State at that time primarily to provide rail transportation to and from the Winter Olympics held at Lake Placid in February 1980.

This is the third opinion to issue from this Court concerning the adversary proceeding instituted over five years ago.

On March 11, 1983, the Court issued a Memorandum–Decision, Findings of Fact, Conclusions of Law and a proposed Order upon the Debtor's motion for partial summary judgment holding, *inter alia*, that the Lease Agreement was still in full force and effect. *See Ehre v. State of New York (In re Adirondack Railway Corporation)*, 28 B.R. 251 (Bankr.N.D.N.Y.1983) (Marketos, J.) (*"ARC I"*). Due to certain jurisdictional limitations, *see infra*, this proposed Order had to be reviewed and finally entered by the United States District Court ("District Court"). On April 12, 1983, the District Court entered an Order which adopted the proposed Order of this Court.

On April 21, 1983, the State filed a Notice of Appeal of the District Court Order to the United States Second Circuit Court of Appeals ("Circuit Court"). The Circuit Court, however, on January 13, 1984, dismissed the State's appeal.

---

1. Debtor filed a voluntary petition for relief under Chapter 11 of 11 U.S.C.A. §§ 101–1330 (West 1979 & Supp.1987) ("Code") on April 1, 1981. On July 15, 1981, Victor T. Ehre, Sr. was appointed Trustee by an Order of this Court.

Following this dismissal, the adversary proceeding resumed. On May 10, 20, and 30, 1985, a trial was conducted before this Court to determine the liability of the State for the Debtor's "extra work" claim.

While the facts leading up to this adversary proceeding were thoroughly set out in *Ehre v. State of New York (In re Adirondack Railway Corporation)*, No. 81–00456 (Bankr.N.D.N.Y. June 27, 1985) (Marketos, J.) (*"ARC II"*), a brief summary of the pertinent events, as fleshed out by counsel in their opening statements, is called for. As early as 1974 and as late as 1981, DOT estimated the total cost of restoring the Remsen to Lake Placid line to Federal Railway Administration standards to be between 3.5 and 3.8 million dollars. Additional studies found that due to "insignificant" potential passenger and freight traffic, the restored line would have an annual operating deficit from $320,000 to $880,000, thereby necessitating an operating subsidy. These studies also predicted a 6.5 million dollar economic benefit to the New York State Adirondack region if the line was restored.

In October of 1975, the Commissioner of DOT gave his support to this restoration of service, which was reiterated in September 1976 by the Governor, on the condition that the funding come from sources other than the Governor's then existing Essential Rail Service Preservation Program. DOT was unable to find any sources other than the United States Economic Development Administration ("EDA"), whose funding was limited to two million dollars per recipient. In May 1976, DOT opened bids for lease offers of the Remsen–Lake Placid line. After a number of meetings between the Debtor and DOT, the former submitted a final proposal in December 1976, incorporating an agreed upon rehabilitation figure of approximately 1.7 million dollars.

The State contends that the difference between the estimates of 3.5 million dollars and 1.7 million dollars lay in the type of operation contemplated, to wit, a conventional rail line with scheduled freight and passenger service versus a tourist railroad. The State also claims that Debtor's proposal was plausible because its costs were lower than the State's with respect to 1) labor, 2) its own self-proclaimed expertise, and 3) access to other financial resources. Furthermore, the State asserts that the four amendments to the original contract stemmed from unforeseen events, inflation, further deterioration of the line, Utica Station improvements and Debtor's inexperience and incompetence.

By Stipulation of the Debtor and the State, only the issue of the State's liability for the "extra work" was tried in May 1985. The parties agreed that should the Court find liability for "extra work", then the actual amount of money due the Debtor would be determined in a subsequent trial. In addition, after resting his case, the Trustee allegedly agreed, with the State's assent, to reduce its damage amount from $843,837.27 to $327,376.57, leaving open the possibility of reducing it further.

On June 27, 1985, the Court issued its Memorandum–Decision, Findings of Fact, Conclusions of Law and proposed Order finding the State liable to the Debtor for "work performed and services furnished by the Debtor in connection with the rehabilitation of the railroad line." *ARC II, supra*, at 26. The Court also granted the Trustee's first cause of action as to the validity of the Lease Agreement, enjoining the State from interfering with the railroad line, dismissed the fraud, deceit and misrepresentation cause of action, and granted the unjust enrichment claim. *Id.* Again, due to certain jurisdictional mandates, *see infra*, this Court's proposed Order was submitted to the District Court for entry of a final order.

On July 7, 1986, the District Court issued its Order adopting the Memorandum–Decision, Findings of Fact, Conclusions of Law and proposed Order of this Court, including the finding of liability against the State for the "extra work".

Following denial of the State's motion to the District Court seeking a reconsideration of its July 1986 Order, a trial to determine the amount of damages was scheduled to commence in this Court on July 16, 1987. Prior to the commencement of trial,

on or about May 1, 1987, the State moved before this Court for an order lifting the automatic stay imposed pursuant to Code § 362. Such motion was intended to compel the Debtor to abandon the Lease Agreement pursuant to Code § 1170(b), or, in the alternative, to provide the State with adequate protection. The State also sought by way of that motion to establish a setoff claim against Debtor for waste to the railroad line and requested that any damages awarded the Debtor in the pending adversary proceeding be withheld by the State pending determination of its waste claim.

The Debtor opposed the relief sought by the State on several grounds. Rather than delay the trial of the adversary proceeding with regard to damages, the Court scheduled an evidentiary hearing on the State's motion for August 12, 13 and 14, 1987, presumably immediately following the completion of the damage trial in the adversary proceeding. The Court also advised the State that it would treat its motion as one to compel rejection of the Lease Agreement (Code § 365) rather than as a motion to lift the automatic stay (Code § 362).

Following three days of trial on the issue of damages for "extra work", the parties notified the Court on July 31, 1987 that a tentative settlement had been reached. On August 12, 1987, both the Trustee and the State appeared before the Court to read the proposed terms of the stipulated settlement into the record. These general terms were

as follows: The Trustee agreed to release Debtor's claim to the Lease Agreement, surrender any related claims or interests and release the State from the Debtor's damage claim. In exchange, the State agreed to tender $200,000 and withdraw its waste claim. However, its counsel stressed that the entire agreement was limited to DOT and the $200,000 was subject to an outstanding public improvement lien in the sum of $80,000 [2] and any other liens that might emerge. The parties also assured the Court that the settlement would be reduced to writing and be submitted to the Court for approval on notice to all of the Debtor's creditors. In response to the Court's concern to move the settlement as quickly as possible, the Trustee expressed the hope to have it finalized by the end of the month.

Subsequently, the Trustee filed a motion on September 15, 1987 for an order approving the compromise and settlement. In support of its application, the motion set out the general terms of the settlement, as understood by the Trustee. "The parties have agreed to settle all claims involved in this lawsuit, including plaintiff's claims relating to the estate's interest in a lease agreement with the State of New York. As part of the settlement, the State of New York will pay to the Trustee the sum of $200,000 without interest, and the Trustee will withdraw, with prejudice, its claim in the lease agreement, and will terminate the railroad right-of-way Lease Agreement."

2. Counsel for the State noted the State Comptroller's position that, absent an order from a court, the State had a statutory duty under the New York Lien Law to hold 150% of the disputed lien sum from the settlement figure of $200,000.

The Court notes that this claim held by Chester Jajo ("Jajo"), arose out of a contract with the Debtor to supply materials for Debtor's work on the railroad job and has been the subject of litigation in this case twice before. First, on or about April 6, 1983, Jajo commenced an adversary proceeding against the Debtor to recover chattels and the payment of proceeds of improvement, as assignee. In June 1985, the parties stipulated that Jajo was to withdraw, discontinue his action and release the Debtor from all past, present and future liability surrounding any work performed or materials delivered. In exchange, the Debtor allowed him to remove all

the rail not incorporated on the railroad line and repossess a caboose and scrap material. The Hon. Justin Mahoney, U.S. Bankruptcy Judge sitting at Albany, New York, entered an Order on August 8, 1985 settling and dismissing, with prejudice, the adversary proceeding. Concurrently, Jajo brought a motion on July 18, 1984 directing the Trustee to liquidate Debtor's assets pursuant to Code § 1174. After an October 3, 1984 hearing, Judge Mahoney denied this motion on October 17, 1984 as being impractical and premature. On October 23, 1987, the Trustee commenced an adversary proceeding against Jajo to determine the validity, priority and extent of his mechanics lien. With respect to this proceeding, Jajo's answer, in the main, admits entering into the August 1985 stipulation, but denies that it included the relinquishment of his claim as a secured creditor of the estate.

Application to Compromise, Settle and Discontinue Adversary Proceeding, at paragraph 9 (Aug. 27, 1987).

In its Affidavit in Opposition the State supported the Trustee's motion as long as certain modifications were made. These included 1) that the "plaintiff's subject motion should not seek to dictate the specific terms and conditions of the proposed settlement" but only to "obtain Court approval of the settlement, and give the Trustee authority to execute all necessary settlement documents", Affidavit in Opposition, at paragraph 3 (Sept. 22, 1987); and 2) that the Trustee's request for relief providing for the payment of $200,000 within fifteen days of the entry of the order is inappropriate, given the necessity of executing documents and all possible appeals, and inequitable, since the settlement depended on a consensus between the parties which could not be reached until, as agreed, the defendant submitted to the plaintiff proposed settlement papers. *Id.*

In two supplemental affidavits, filed October 5 and 21, the State repeated the grounds for its partial opposition to the Trustee's motion. It also responded to the objecting creditors, *see infra*, by asserting the irrelevance of Chapter 11's Subchapter IV Railroad Reorganization provisions, Code §§ 1161–1174, to the entire case and expressing a concern that Code § 363 be followed "so that the settlement will be valid in all respects." Second Supplemental Affidavit in Opposition, at paragraph 4 (Oct. 20, 1987).

On September 28, 1987, a hearing was held before this Court on the proposed compromise, settlement and discontinuance of the adversary proceeding. Several persons appeared at the hearing in addition to the parties, some of whom were creditors and some of whom merely expressed an interest in the settlement insofar as it purported to authorize the Debtor to withdraw, with prejudice, its claim in the Lease Agreement.

Although there are no formal settlement documents before the Court, the Court concludes from the moving papers and the August 12, 1987 hearing, that the proposed settlement likewise disposes of all the claims advanced by the State in its May 1, 1987 motion which sought, *inter alia*, a rejection of the Lease Agreement and damages for waste.

The Court notes that at the settlement hearing, the attorney for the Trustee could only estimate the destination of the $200,-000.00 to three groups: 1) twenty percent of the net recovery to a remaining secured creditor, Chase Lincoln Bank ("Chase"); 2) payment of Jajo's pending, disputed lien claim, *see supra* note 3; and 3) the payment of administrative expenses, including the Trustee's commission, and his attorney's and experts' fees. The attorney for the Trustee could not foresee what, if any, monies would be available for the unsecured creditors.

Counsel for Chase also appeared at the hearing in support of the settlement, noting that its participation in the settlement as a secured creditor would also result in its status as the largest unsecured creditor. Other alleged unsecured creditors holding considerable claims, Helmers Fuel & Trucking, Jil Lindenmeyr and Track Works, Inc., appeared by singular counsel in opposition. In subsequently filed written objections, they charge that the settlement constitutes a sale of the Lease Agreement pursuant to Code § 363(b) or, in the alternative, an abandonment of the railroad line under Code § 1170(a). The creditors argue that, in either case, notice and a hearing is required at which the Court must either entertain other offers for purchase of the Lease Agreement (Code § 363(b)) or conclude that the abandonment of the Lease Agreement is both in the best interest of the Debtor estate and consistent with the public interest (Code § 1170(a)).

The Trustee denies that its application is an attempt to circumvent the procedural requirements of Code § 363(b) since part of the adversary proceeding involved a declaratory judgment of the lease's validity. Having received a favorable judgment on June 27, 1985 from this Court, the Trustee views the instant compromise and settlement as an appropriate end to the entire adversary proceeding. *See* Letter from

Thomas C. Buckel, Jr., Esq. to Hon. Stephen D. Gerling (Oct. 7, 1987). Furthermore, the Trustee asserts that Code § 1170(a) is similarly not pertinent since it is not abandoning a railroad line, but simply seeking to terminate a lease. Even if it was proposing an abandonment, the Trustee, citing *In re Auto–Train Corp.*, 11 B.R. 418 (Bankr.D.C.1981), contends that it is not required to comply with Interstate Commerce Commission procedures because the Debtor is "cashless" and the railroad line was de facto abandoned for more than two years. *See* Letter from Thomas C. Buckel, Jr., Esq. to Hon. Stephen D. Gerling (Oct. 19, 1987).

While the attorney for Jajo, the alleged unpaid lien creditor, did not object to the settlement, he indicated his intent to enforce his client's alleged lien against the settlement proceeds.

In addition, other parties, technically lacking standing, appeared in opposition to the settlement. Most significant were William Kuntz, III ("Kuntz"), who is affiliated with Westrail Transport Systems and Drax Services, Ltd., Dr. Ronald J. Goldstone ("Goldstone"), on behalf of the Adirondack Transportation Corporation, and a representative of the Utica Area Chamber of Commerce, Inc. All were critical of the Trustee's proposed relinquishment of the Debtor's rights under the Lease Agreement. Kuntz and Goldstone suggested that the Agreement constituted an extremely valuable asset, and with an infusion of substantial capital, the Remsen to Lake Placid line could once again provide direct rail service through the Adirondack wilderness and revitalize the economy of the so-called North Country of New York State.

Moreover, since the date of the hearing, the Court has received voluminous correspondence from other interested parties, all opposing the settlement, at least to the extent that it results in giving up the Lease Agreement. The attorney for the Trustee maintains that great efforts were made from the beginning to explore the possibility of rehabilitating the railroad. After meetings with groups and individuals, he eventually concluded that no one displayed sufficient funding capabilities. Consequently, the Trustee determined liquidation via the proposed settlement as the only viable alternative since no concretely funded programs were "on the table." *See* Letter from Thomas C. Buckel, Jr., Esq. to Hon. Stephen D. Gerling (Oct. 7, 1987).[3]

## JURISDICTIONAL STATEMENT

In previous decisions concerning the Debtor, *see ARC I, supra,* and *ARC II, supra,* the Court has concluded that this adversary proceeding is a "related proceeding" pursuant to 28 U.S.C.A. § 1334(b) and § 157(b)(3) (West 1979 & Supp.1987). Therefore, any findings of fact, conclusions of law and proposed order must be submitted to the District Court for entry of a final order pursuant to 28 U.S.C.A. § 157(c)(1) (West 1979 & Supp.1987).

## DISCUSSION

There can be no dispute that a bankruptcy court has the authority to approve the compromise and settlement of any adversary proceeding or contested matter pending before it. *See* Rule 9019 of Federal Rules of Bankruptcy Procedure ("Fed.R. Bankr.P."). In exercising that authority, the bankruptcy court must rely upon its sound discretion. *See Drexel v. Loomis,* 35 F.2d 800 (8th Cir.1929); *Port O'Call Investment Co. v. Blair (In re Blair),* 538 F.2d 849 (9th Cir.1976); *Fogg v. Sherman*

---

**3.** On or about October 24, 1987, the Trustee was apparently offered one million dollars at face value of zero coupon subordinated redeemable debenture securities, due November 1, 2000, for the assets of the Debtor. *See* Letter from William Kuntz, III to Victor Ehre (Oct. 24, 1987). On November 2, 1987, the Trustee informed the Court that its own sources had determined the debentures to be worthless. *See* Letter from Richard W. Cook, Esq. to Hon. Stephen D. Ger-

ling (Oct. 30, 1987). The latest missive the Court received from Kuntz, long active in this case allegedly as a concerned citizen, railroad enthusiast and, at one time, litigant, strongly rebuts the Trustee's finding and in support, presents, among other things, the address and phone number of the securities' issuer, Bastian Industries, Inc. *See* Western Union Mailgram from William Kuntz to Hon. Stephen D. Gerling (Nov. 10, 1987).

Homes, Inc. (In re Sherman Homes, Inc.), 28 B.R. 176 (Bankr.D.Me.1983).

This discretionary review of any compromise must be guided by certain criteria, as well as policy considerations favoring compromise. *In re Lion Capital Group,* 49 B.R. 163, 190 (Bankr.S.D.N.Y. 1985). In *Drexel v. Loomis, supra,* the Eighth Circuit enumerated some of the guidelines: "a) the probability of success in the litigation; b) the difficulties, if any, to be encountered in the matter of collection; c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Id.* at 806. *See also Protective Comm. for Indep. Stock. v. Anderson,* 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the possibilities of ultimate success should the claim be litigated."). Thus, as one district court has concluded, "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." *Estate of Patel v. Patel (In re Patel),* 43 B.R. 500, 505 (N.D.Ill.1984).

Moreover, the Second Circuit has recently sounded a note of caution in examining a settlement. "[W]e emphasize that this responsibility of the bankruptcy judge, and ours upon review, is not to decide the numerous questions of law and fact raised by appellants, but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'." *Casoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.1983) (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom. Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)). In this vein, Bankruptcy Judge Howard C. Buschman,

III in *In the Matter of Carla Leather, Inc.,* 44 B.R. 457 (Bankr.S.D.N.Y.1984), *aff'd.* 50 B.R. 764 (S.D.N.Y.1985), accurately analogized the bankruptcy court's review of a settlement to court consideration of a class or derivative action pursuant to the Federal Rules of Civil Procedure 23 and 23.1. "In those cases, a reasonableness standard applies, the courts comparing the *substantive terms* of the proposed settlement with the likely result of a trial". 44 B.R. at 466 (and cases cited therein) (emphasis added).

Implicit in this decisional law is that the Court have before it an agreement to terminate a controversy, demonstrating a meeting of the minds between the adversaries, complete with specific and concrete terms and, in most instances, accompanying documents. That is not the case here. Notwithstanding the fact that the promised documents of settlement are not before the Court, the terms of the settlement are no more fleshed out than they were at the August 12, 1987 hearing. Nothing specific, concrete or substantive has emerged over some three months from either one of the parties, other than what was already a bare "this for that".

While every settlement entails negotiations en route to finalization, the parties generally proceed along some common ground. The common ground here appears to be rapidly diminishing to a vanishing point. For example, in its opposing affidavit, the State chastises the Trustee for making the instant motion in advance of it providing the Trustee with the proposed settlement papers, which the State says it agreed to prepare. Thus, in light of its own failure to draft the settlement documents prior to the return date of the motion, the State indicates that it will be required to "only enter into a settlement upon terms and conditions which are acceptable to defendant [State]." Affidavit in Opposition, at paragraph 3 (Sept. 22, 1987).

In addition, the State, which had initially joined with the Trustee in urging the settlement, now appears to be hedging its support in characterizing its willingness to settle as "contingent". Supplemental Affida-

vit in Opposition, at paragraph 4 (Oct. 2, 1987). "It must withhold any final approval of the settlement, pending its review of the Court's decision in response to the Trustee's application, and any ensuing order." Second Supplemental Affidavit in Opposition, at paragraph 4 (Oct. 21, 1987). In support of its position, the State draws on the railroad reorganization provisions of the Code, the status of the outstanding liens, both known (Jajo) and potential and raises the spectre of the New York State Comptroller retaining up to three-fifths of the settlement sum, notwithstanding the objections of other State departments, agencies or authorities. Thus, the State is now proposing, at best, a qualified agreement, subject to its own ultimate approval, not the Court's. *Contra* Fed.R.Bankr.P. 9019(a).

▮ An agreement to compromise and settle a claim is a contract governed by the ordinary rules of contract interpretation. *See Interspace, Inc. v. Morris*, 650 F.Supp. 107, 109 (S.D.N.Y.1986); *Mikropul Corp. v. Desimone & Chaplin–Airtech, Inc.*, 599 F.Supp. 940, 943 (S.D.N.Y.1984); *Fustok v. Conticommodity Services, Inc.*, 577 F.Supp. 852, 858 (S.D.N.Y.1984). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 3 comment e (1981) (referring to § 94, Stipulations, as a contract). While binding without consideration, *id.* at § 94, the agreement must still contain promises. *Id.* at § 1 comment g. It is hornbook law that illusory promises or mere statements of intention,

> which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested,

the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance.

*Id.* at § 2 comment e. Hence, the State's return promise imposes no obligation on itself since it amounts to an "I will if I want to", rendering the settlement, as a matter of law, anything but binding. *See Fustok v. Conticommodity Services, Inc., supra*, 577 F.Supp. at 858. It is a promise in form but not in substance.

▮ The Court has before it a tentative agreement to agree, rife with too many holes, loose ends and contingencies—certainly not the "meat and potatoes" of a compromise and settlement.[4] The Court concludes that the parties, in reality, have not reached any settlement within the meaning of Fed.R.Bankr.P. 9019(a) or Rule 46(B) of the Local Rules of Bankruptcy Practice for the Northern District of New York. In transferring their dispute from the adversary proceeding into the settlement arena, the Trustee and the State are no closer today to settling their differences than they were on August 12, 1987. Court approval of the proposed "settlement", in its current legally unenforceable state, will, in all probability spawn even more litigation with respect to its implementation. The Court refuses to sanction such waste and views the continuation of the trial for damages of the adversary proceeding or further negotiations resulting in a true settlement the sounder and ultimately more expedient course of action.

▮ Notwithstanding the foregoing conclusion, the Court has reviewed the substance of the Trustee's Application to Compromise, Settle and Discontinue Adversary Proceedings which, at paragraph 10, purports to address the factors enumerated in *Drexel v. Loomis, supra*, 35 F.2d at 806.

With regard to the probability of success, the Trustee cites its problems of proof, specifically pointing to the incompleteness

---

**4.** Compromise and settlement. An arrangement arrived at either in court or out of court for settling a dispute upon what appears to the parties to be equitable terms, having regard to the uncertainty they are in regarding the facts, or the law and the facts together. An agreement or arrangement by which, in consideration of mutual concessions, a controversy is terminated. BLACK'S LAW DICTIONARY 260 (5th. ed. 1979).

of the Debtor's records in reconstructing its damage claim concerning services performed seven to nine years ago. The Court finds this position somewhat untimely. The trial of the adversary proceeding as to damages has already progressed through some three days of testimony offered by the Trustee's witnesses, utilizing books and records of the Debtor.

The Trustee further points to the delay which will almost certainly be caused by the State appealing any adverse decision. Such an appeal, argues the Trustee, would only serve to escalate administrative expenses, thereby reducing any projected distribution to creditors. The Trustee also suggests that the State may be able to prolong the litigation by raising a jurisdictional objection, despite this Court's treatment of the adversary proceeding, from the start, as a related proceeding pursuant to 28 U.S.C. § 157(c). Moreover, no explicit reference is made in the Trustee's application to any impediments to the collectibility of any judgment. As noted above, however, the State has amply hinted at the potential impediments throughout this litigation, by limiting the settlement strictly to DOT and in noting the Comptroller's statutory duty to withhold 150% of the disputed amount of the Jajo claim and comply with § 112(2) of the New York State Finance Law.[5]

Clearly, the Court shares the Trustee's concern for the expense and delay occasioned by further litigation, and its effect on the estate and creditors. However, that concern may be overstated when a closer look is taken at the present litigation.

The instant adversary proceeding was commenced over five years ago with an emphasis on the Debtor's anticipated recovery of approximately one million dollars in "extra work" damages and a final declaration as to the status of the Lease Agreement. As previously detailed, the progress of the proceeding has been painfully slow. In fact, one could surmise that many of the creditors have given up all hope of ever recovering any distribution on their claims. One might then argue that additional expense and delay at this juncture is of little consequence, and a minor detriment at worst.

When considering the further expense and delay caused by denying the compromise and settlement, one must necessarily weigh its impact on the "paramount interest of creditors". *Drexel v. Loomis, supra,* 35 F.2d at 806; *see also In re Sherman Homes, Inc., supra,* 28 B.R. at 178. The Court is troubled by the Trustee's inability to forecast any distribution to the unsecured creditors under the present settlement. While it is of some consequence that the attorney for Chase has indicated to the Court its full support of the settlement, even though upon receipt of twenty percent of the settlement sum, it will then be the Debtor's largest unsecured creditor, Chase is not truly representative of the unsecured creditors. Chase holds a bifurcated claim, unlike the other unsecured creditors who have received nothing as of this date. Although the Court obviously has control over the allowance of administrative expenses to professionals, it appears that depending upon the outcome of the Jajo lien claim, and considering the approximately $30,000.00 the Trustee presently has on hand,[6] the unsecured creditors will receive little or nothing after some six years of anticipated reorganization and now liquidation.

The Trustee has also indicated at trial, that he planned to submit proof regarding damages in excess of the $327,376.57 his predecessor allegedly stipulated to on May 20, 1985. While questioning this position,

---

**5.** § 112(2) provides:
Before any contract made for or by any state department, board, officer, commission, or institution, shall be executed or become effective, whenever such contract exceeds five thousand dollars in amount, it shall first be approved by the comptroller and filed in his office. Whenever any liability of any nature shall be incurred by or for any state department, board, officer, commission, or institu-

tion, notice that such liability has been incurred shall be immediately given in writing to the state comptroller.
N.Y.STATE FIN.LAW § 112(2) (McKinney Supp.1987). *But see ARC II, supra,* at pp. 20–24.

**6.** *See* Trustee Account Records, submitted by Victor T. Ehre, at page 4 (Oct. 19, 1987) (reflecting a net balance of $33,096.92 as of September 30, 1987).

the Court notes that even the allegedly reduced damage claim is some $127,000.00 more than the settlement sum. This difference approximately equals the amount the State is proposing to withhold under the New York State Lien Law with respect to the Jajo claim and could conceivably generate a return to the unsecured creditors, where, previously, none could be guaranteed.

Turning to the aspect of the settlement which requires a forfeiture of Debtor's rights under the Lease Agreement, the Court notes that it is this concession by the Debtor which has sparked public attention.

Assuming arguendo, that the position of the three objecting unsecured creditors is valid, and pursuant to Code § 1170(a) the Court must concern itself not only with the best interest of the estate, but also with the public interest, there is ample evidence of public opposition to the abandonment and/or surrender of the Debtor's rights under the Lease Agreement. In any event, the Court believes that *In re Auto Train Corp., supra,* is on point with respect to the Debtor's situation, thus rendering Code §§ 1169 and 1170 inapposite. Furthermore, the Court regards the procedural requirements of Code § 363(b), if applicable, as having been met since the settlement hearing was conducted on notice to creditors.

In spite of public and creditor opposition, the Court is convinced that without a substantial infusion of capital into the Debtor or outright purchase offer from a third party with the adequate financial capabilities, (noticeably absent throughout this bankruptcy case, but for Kuntz's recent offer), neither the Debtor nor any third party can realistically expect to restore train service from Remsen to Lake Placid.[7]

Whether or not the Lease Agreement is a valuable asset of the Debtor at this junc-

ture is questionable. This is true not only from the perspective that for a period in excess of five years the Debtor has apparently been unable to raise the necessary funds to enable it to utilize its rights under the Lease Agreement, but also since it has not attracted any firm offer for the purchase of the Lease Agreement up to the date of the proposed settlement. A further detriment to its alleged value is the State's present position that the Lease Agreement has been continually breached by the Debtor, and that, in reality, while it once may have had some value, it is presently a nullity.

While the Court may share the belief that rail transportation through the Adirondack wilderness as a link to a mecca of tourism such as Lake Placid, has both aesthetic and economic benefits to the "North Country" area of New York State, it is not the overriding concern of the Court were it to pass solely upon the merits of the settlement before the Court.[8]

## CONCLUSION

Given its obvious contingencies and uncertainties, its lack of substantive terms and the existence of an "eleventh hour" proposition offering the Debtor one million dollars for all of its assets, the Court finds that the proposed "settlement", under the present circumstances, "falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co., supra,* 699 F.2d at 608. *See also In re Carpetmakers Warehouse,* 55 B.R. 102 (Bankr.S.D.Fla. 1985) (approval denied where net effect of agreement would be to leave remaining creditors virtually nothing and would work a fraud on public tending to undermine confidence of community in bankruptcy court).

Even assuming the settlement is more than tentative and is, in fact, binding, the

---

7. *See supra,* note 2.

8. The Court understands the public endeavors to "save the Adirondack railway", *see, e.g.* Observer–Dispatch, June 14, 1987 at 3C, col. 3 and June 20, 1987, at 10A, col. 1, but its responsibility lies in equitably and expeditiously interpreting the bankruptcy laws. This translates into granting financial relief to distressed debtors in

the form of reorganization or liquidation while generating the maximum monetary distribution to creditors through a sorting out of each debtor's assets and liabilities. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. at 10 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, *reprinted in* Bkr.L.Ed. Legislative History § 82.2 at 18 (1979 ed.).

same result is demanded under the four-part test established by the *Drexel* court, *supra,* 35 F.2d at 806. Neither the inability to collect, the complexity of the case, nor the expense and delay attendant upon a completion of the trial of the issues presently before the Court will impact any more adversely upon the paramount interest of the creditors than were the Court to approve this settlement.

Thus, the Court must conclude that, in all fairness, the proposed settlement fails.

For the foregoing reasons, it is the proposed Order of the Court that:

a) the Trustee's Application to Compromise, Settle and Discontinue Adversary Proceeding be denied;

b) the Trustee and the State prepare to resume the trial of the adversary proceeding within thirty (30) days of the date of entry of the final Order of the District Court;

c) the hearing of the contested matter, in which the State seeks a rejection of the Lease Agreement and damages for waste, be rescheduled pending completion of the adversary proceeding.

Dated at Utica, New York this 25th day of November, 1987.